\*A. & J. UNDERHILL *against* VAN CORTLANDT and others.

VAN CORTLANDT and others *against* A. & J. UNDER-HILL.

The deposition of a witness, whose examination was not closed until after publication had passed, was allowed to be read, he having been cross-examined by the opposite party, and no actual abuse appearing; but such practice is irregular.

A witness should go before the *examiner*, free to answer all interrogatories, and not with a deposition already prepared.

If a *cross* bill contains a charge of fraudulent misconduct in arbitrators, but no such allegation is made in the *answer* to the *original* bill, though by a general order of the Court, the depositions taken in the *original* suit are allowed to be read in the *cross* suit, yet such parts of those depositions as relate to the fraudulent misconduct, not charged in the *original* suit in which they were taken, will be suppressed.

Proof taken in a cause must be pertinent to the issue in that cause; *secundum allegata.*

What misconduct of arbitrators is a sufficient ground for setting aside an award.

Where a lease contains a covenant, that the mills and other buildings erected on the premises, by the lessee, should, at the end of the term, "be appraised and valued, by two persons indifferently chosen by the parties, and in case of their disagreement, by a third person chosen by the two;" a nomination by each party of one appraiser, with the assent of each to the nomination of the other, is binding on them, and a compliance with the covenant.

Where an *umpire* is chosen by two arbitrators, and they join in the umpirage, it is good; for the umpire may take what advice or assessors he pleases.

If there is no corruption or partiality in arbitrators, nor any misconduct during the hearing, nor any fraud practised by either party, the award is binding and conclusive, and cannot be set aside by the Court, however unreasonable or unjust the award may appear.

Where a defendant puts in an answer instead of demurring to the bill, and the cause comes on to be heard, upon the merits, it is too late to object to the jurisdiction of the Court, on the ground that the plaintiff has adequate remedy at law, which he might have pursued.

THESE were *original* and *cross* suits. The *original* *January* 27th. bill, filed the 30th of *September*, 1813, stated, among other things, that the defendants in that suit, on the 18th of *February*, 1792, by indenture, leased to *Robert Underhill* and to the plaintiffs, *Abraham* and *Joshua Underhill*, and to *Thomas* *and *William Burling*, a mill-place and land, at [ * 340 ] *Croton*, of 70 acres, for the term of 21 years from the 1st of *May*, 1792, at the annual rent of 40 pounds a year; and it was covenanted, "That the lessees might, at their discretion, build any mills and other buildings on the premises, during

the term, and cut down and use for building, as aforesaid, good timber within two miles of said premises, and the lessor would show where the same was to be cut." "That at the expiration of the term, the mill or mills then standing, and whatever might appertain thereto, should be appraised or valued by two persons indifferently chosen by the parties, and in case of their disagreement, by a third person, to be chosen by the two, and the said appraisement should be binding on the parties; and the lessors should pay to the lessee the amount of the appraisement, deducting only from the same the value of the timber which the lessors should find as aforesaid, as it was then standing; and that all other buildings, then standing on the premises, should, in like manner, be appraised, and the amount, not exceeding 200 pounds, should be paid to the lessees by the lessors," &c.

Owing to some *mistake*, the plaintiffs did not execute the lease, yet they accepted the same with the other lessees, and were equally concerned in the same, and were so considered by the other lessees, and by the lessors. The lessees took possession of the demised premises, erected a mill, built a dam, built a dwelling-house, barns, and other outhouses, and paid rent, &c.

*Thomas* and *William Burling*, on the 5th of *February*, 1799, sold and released their interest in the lease to *Robert Underhill* and the plaintiffs; and, in *April*, 1804, *Robert Underhill* sold and released all his interest in the premises to the plaintiffs.

On the 1st of *May*, 1813, the plaintiffs and defendants mutually chose *Nathan Anderson* and *Samuel Mott*, appraisers of the mill and buildings under the lease; and *the appraisers met and examined the mill, &c., but not being able to agree on their value, they chose *David Lydig* to be the *third* person, or umpire, to whom no objection was made by either party. *Anderson* and *Mott*, with the consent of the defendants, agreed to adjourn their meeting until *Lydig* could attend. On the 8th of *July*, 1813, the three appraisers, with the parties or their agents, met on the premises, and viewed the mills, buildings, &c., in presence of the parties or their agents, and having heard the parties, made their appraisement in writing, under seal, by which they valued the mills, and whatever was appurtenant thereto, belonging to the plaintiffs, at 18,000 dollars, and the other buildings thereon, exclusive of the timber furnished by the defendants, and the movables thereon, at 500 dollars. The award was executed by the three appraisers, and a copy delivered, on the same day, to each of the defendants, and a copy to the plaintiffs. The plaintiffs then offered to surrender up the premises to the defendants, on being paid

[ * 341 ]

the amount of the sum or value so awarded, and to allow 200 dollars for the timber used, but the defendants rejected the offer, and refused to pay the amount of the appraisement. That, notwithstanding such refusal, the plaintiffs, on the 15th of *August*, 1813, delivered up the possession to *T. C. Van Wyck*, the agent of the defendant *Pierre Van Cortlandt*, by delivering to him the keys. That *Philip Van Cortlandt* pretended that he had no interest in the premises, and that they belonged wholly to the other defendant, *Pierre Van Cortlandt*, and that, though he joined in the lease, he was not bound to pay the appraisement. The plaintiffs charged that both the defendants were equally bound to pay the appraisement, deducting the value of the timber; and prayed that the defendants might be decreed to pay to the plaintiffs the 18,000 dollars, with interest thereon from the 1st of *May*, 1813, and 500 dollars for the *other buildings, with interest, deducting the value of the timber cut and used for building, to be accounted for, as the Court might direct, with costs, &c.

The defendants, in their answer, filed the 10th of *January*, 1814, admitted most of the facts charged in the bill to the year 1813, and stated various matters relative to the choice of appraisers, their conduct, and the award, on account of which they alleged the valuation to be erroneous, excessive, and void.

The bill in the *cross* suit was filed the 23d of *June*, 1815, by *Philip Van Cortlandt*, and four others, all children of *Pierre Van Cortlandt*, one of the defendants in the original suit, who died the 1st of *May*, 1814, and his devisees, and three of them executors of his last will, against the plaintiffs in the original suit, and *Anderson, Mott,* and *Lydig*, the three appraisers.

The *cross* bill stated the death of *Pierre Van Cortlandt*, &c., and the lease made in his lifetime. It alleged various matters relative to the premises leased, the conduct of the lessees, and the behavior of the appraisers, to show that the appraisement was not fairly made, and that the valuation was unreasonable and excessive; that since the lessors answered the original bill, and before publication, the testator died; that a bill of revivor and supplemental bill had since been filed against the plaintiffs, &c. The bill prayed for a *discovery* of the matters alleged, that the appraisement might be set aside, and the value be ascertained in some proper way; that the plaintiffs may be allowed to set off, against the valuation, their damages for *waste*, committed by the lessees, &c., the value of timber cut and carried away, to be ascertained in some proper way, &c.

The plaintiffs in the original suit put in their joint answer

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

[ * 342 ]

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

[ * 343 ]

to the cross bill, and the three appraisers answered sepa-
rately; but, by an order of the 27th of *May,* 1816, the *bill
was amended, and *Anderson,* one of the defendants, was
struck out.

A great number of witnesses were examined on both sides,
in the *original* suit, and, by an order of the Court, the
depositions taken in the original suit were allowed to be read
in evidence at the hearing in the *cross* suit, except the
deposition of *Anderson,* one of the appraisers, whose name
had been struck out of the bill in the *cross* suit, in order
that he might be examined as a witness.

The allegations in the pleadings, and all the material parts
of the evidence, in both suits, are so fully stated in the
opinion delivered by the Court, that any further statement
of them here is unnecessary.

Both suits came on to be heard, and were argued together,
on the 28th of *October* last.

*Riggs,* for the plaintiffs in the *original* suit, and for the
defendants in the *cross* suit.

*T. A. Emmet,* and *P. C. Van Wyck,* contra.

January 20th.

The cause stood over for consideration to this day, when
his honor the chancellor being about to deliver his opinion,
the counsel for the plaintiffs in the *cross* suit presented a
*petition,* stating that the plaintiffs had concluded that it
would be more eligible for them, instead of paying the
18,000 dollars, at which the mills, &c. had been valued by
the appraisers, to release the premises to the defendants;
and they therefore prayed a decree that they might release
the premises, in fee, with the land on which the mills, &c.
were erected, and such quantity of land adjacent as might
be necessary to the free and full enjoyment of the premises,
within such limits, &c. as the Court should deem reason-
able, &c.

[ * 344 ]

*THE CHANCELLOR said he would defer giving a decree in
the cause until the counsel for the plaintiff, in the original
suit, would have an opportunity of communicating the
proposition contained in the petition to their clients, and
obtain their answer.

January 27th.

THE CHANCELLOR. The original suit between these
parties was brought to enforce the performance of an award,
and the cross suit was for the purpose of relief against it.

The sum awarded on the valuation of certain property,
was 18,500 dollars, and this has been deemed by the party

against whom it was awarded, as an excessive valuation. A variety of objections have, accordingly, been taken to the proceedings of the arbitrators, which have necessarily led the parties into voluminous pleadings and proofs, and it now becomes my duty to give to these objections all the consideration and discussion to which they may be entitled.

The misconduct of arbitrators is one ground for setting aside an award. The misconduct charged in this case is principally from the refusal to hear evidence offered by one of the parties, and from holding a private and *ex parte* communication on the subject before them with the opposite party.

1. As to the rejection of evidence.

The cross bill charges that *Theod. C. Van Wyck*, the agent of *Pierre Van Cortlandt*, one of the defendants in the original suit, informed the appraisers before they made their award, that " he had material testimony to submit respecting the matters submitted, and that *Lydig*, one of the appraisers, declared he could not wait to receive the testimony, and this declaration was not opposed by the other appraisers, and in consequence of that declaration the testimony was not produced." The same charge was made by the defendants in the answer to the original bill.

*In support of this charge, *Anderson*, one of the arbitrators, was examined, who stated, that before they finally retired to deliberate, *Van Wyck* " offered some evidence which *Lydig* refused to hear, telling him that he did not think the appraisers were bound to receive any." The next witness, in support of the charge, is *Van Wyck*, the person who offered the testimony: he says he offered " to bring witnesses to prove that the raceway would not cost, at the present rate of wages, more than 1,000 dollars. That *Lydig* replied, that he could not wait to receive such evidence. That *Van Wyck* then offered to go into the evidence immediately, and no answer was given by either of the arbitrators, which he considered a refusal."

[*345 ]

An objection has been raised to the competency of the deposition of *Van Wyck*, on the ground that his examination was not closed by the examiner, until after publication had passed. The examiner certifies, that it commenced on the 28th of *June*, and was continued to the 5th of *July*. How this irregularity arose does not appear, nor is it suggested that any actual abuse has arisen in consequence of it; and the witness was cross-examined on the part of the *Underhills*, in the same way. I do not incline to suppress the deposition, and deprive the party entirely of the benefit of *Van Wyck's* testimony. It would seem to be too rigorous, when the other party has had the benefit of a cross-examination, and has not raised the objection until the hearing, when no

The deposition of a witness whose examination was not closed until after publication had passed,

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

was allowed to
be read, he hav-
ing been cross-
examined by
the opposite
[ * 346 ]
party, and no
actual abuse
appearing.

A witness
should go before
the examiner,
free to answer
all interrogato-
ries, and not
with his depo-
sition already
prepared.

re-examination can be had, and when no ill use is stated to have been made of the irregularity. The question whether the deposition shall be suppressed is a matter of discretion; and in *Hammond's case*, (*Dickens*, 50.) and in *Debrox's case*, (cited in 1 *P. Wms.* 414.) the deposition of a witness examined after publication, was admitted, in the one case, because the opposite party had cross-examined; and in the other, because the testimony would otherwise have been lost forever.

*The deposition of *Anderson* is also objected to.

The order allowing depositions taken in the original cause, to be read in evidence in the cross cause, excepted that of *Anderson*, and he was, consequently, examined in the cross cause; but how was he examined? By copying his deposition in the original cause. He went, therefore, before the examiner with a prepared deposition. This is against the course and policy of the Court, and it would lead to the most dangerous practices. The witness ought to go before the examiner, as Lord *Coke* observes, (4 *Inst.* 279.) " untaught, and without instruction." He should be free to answer the sifting interrogatories that are framed for the issue *in that case*, instead of merely filing an affidavit ready drawn. I should, undoubtedly, be justified in totally suppressing the deposition of *Anderson*, in the cross cause, if I was to follow the strict rule of authority. (*Amb.* 252. *Anon. Shaw* v. *Linsey*, 15 *Vesey*, 380.) If I have allowed it to stand, in consideration of the regularity of the original deposition, I hope it is an indulgence that will never be abused.

In opposition to the evidence of *Anderson* and *Van Wyck*, we have the answers of *Abraham I. Underhill, Mott* and *Lydig*, who give a full explanation of the fact. They all separately state to this effect; " that after the appraisers had heard the allegations and proofs of the parties, and had conferred together, *Van Wyck* came into the room, and offered to produce witnesses, to prove the actual cost of the dam and raceway; that the witnesses were not present, and *Lydig* told him, with the acquiescence of the other two appraisers, that such testimony was not material or relevant, as the inquiry was not what the works had cost, but what they were then worth; and they all deny that *Van Wyck* offered any other testimony, or to any other point."

*Mott* and *Lydig*, in their depositions, taken in the original cause, equally disprove the allegation of a refusal to hear *testimony. *Lydig* says, the appraisers did not refuse to receive further testimony offered, or ready to be offered, by either party, as long as it appeared to have any bearing on the appraisement; that no witnesses were offered to prove

[ * 347 ]

270

the cost or value of the premises, and if either party had requested further time for that purpose, the appraisers would have allowed it. *Mott* also testifies, that the parties were asked if they had any thing more to offer or produce, and they said, nothing further; that *Van Wyck* asserted, in the room, that the mill-dam had not cost as much as the plaintiffs had intimated, and *that* could be shown as a fact, and he urged the appraisers to take it into consideration; and they answered, that it was their business to value the property according to its present value, and not at its original cost.

It has been said, that there is some variance between the depositions of *Mott* and *Lydig* in the original cause, and their answers in the cross cause, but I do not perceive it. Their depositions are, indeed, more general than their answers: this, probably, arises from the particular and sifting nature of the charges and interrogatories in the cross bill. The only expression that even looks contradictory, is one of *Lydig's*, in his deposition, that no witnesses were offered to prove " the cost or value" of the premises. But I think we are bound, in all candor, to conclude, that the word *cost* was here used as synonymous with the word value, with which it is coupled, because, in his answer, he explains fully the offer as to the original cost.

It appears to me, then, to be a just and necessary conclusion, from this proof, that the only testimony offered by *Van Wyck* was that relating to the original cost of the dam and raceway. The weight of evidence is decidedly against any other conclusion. *Van Wyck* stands alone against the answer of *Underhill*, and the answers and depositions of *Mott* and *Lydig*. I say, he stands *alone*, for the deposition *of *Anderson* is general, and does not state what was the nature of the evidence offered, or to what point, and it may as well relate to the original cost of the works as to any other object. His testimony may be rendered consistent with that of the other appraisers.

It cannot surely become a question, whether evidence of the cost of a dam and raceway, built 21 years before, was material in an inquiry as to their existing value. There could be very little, if any, analogy, between the original cost and the present value, considering the space of time which had intervened, and the great variations in prices, labor and business, and many other circumstances connected with such works. I doubt, whether any Court of justice would have deemed such evidence, in such a case, pertinent. Instead of being useful in guiding the judgment, it would probably have been delusive or injurious. There was then no misconduct, or even the want of due discretion, in the arbitrators, in expressing a disinclination to wait until such

[ * 348 ]

What misconduct of arbitrators is a sufficient ground for setting aside an award.

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

immaterial, if not absolutely improper, testimony, might have been hunted up and produced.

2. Another charge is, that the appraisers held a private and *ex parte* communication with *Abraham I. Underhill,* while they had the subject under deliberation. This charge is made in the answer to the original bill, and also in the cross bill, and the proof of it rests upon the single uncorroborated deposition of *Anderson.* He says it was proposed by him, the witness, to call in *Underhill,* to ask him what money was laid out on the mill, dam and raceway, and that he was alone in the room, when the question was put to him, and that he stated that the plaintiffs had laid out 20,000 dollars.

[ *349 ]

In answer to this charge, *Underhill* states, that he was called into the room, where the appraisers were deliberating, and that *Thomas Van Cortlandt* and *Van Wyck* went in with him, and that some question was asked him by *Anderson* relative to the cost of the dam and raceway, and he *answered he did not know, as no separate account thereof was kept, but only an account of the costs of the whole works ; and he denies that he had, at that or at any other time, any *ex parte* or private communication with either of the appraisers on the subject of the appraisement, while the same was under deliberation. The answers of *Mott* and *Lydig* state, that *Underhill* was sent for to obtain some information relative to the mill of *Thomas Van Cortlandt,* which was also submitted to their appraisement, (though unconnected with this controversy,) and that *Van Cortlandt* was sent for at the same time, and was present with *Van Wyck,* and they have no recollection, and one of them says, no belief, of any question being asked relative to the cost of the dam, raceway, &c. ; and they deny that any of the appraisers held any *ex parte* or private conversation or communication with him, in the absence of the other parties.

The weight of evidence is clearly against the charge. The question which *Anderson* put to *Underhill,* was not put by the direction or sanction of the board ; it was when the other party was present, and no answer was given communicating any thing material. It would be very unjust, and altogether unprecedented, to allow such a circumstance to affect the validity of the whole proceeding ; and it may be proper to observe, in this place, that the credit of *Anderson,* as a witness, is extremely impaired by his own confessions and conduct. He is called as a witness to impeach his own award and his own integrity ; and this case falls within the reason and policy of the rule at law, (4 *Johns. Rep.* 487. 4 *B. & Pull.* 326. 4 *Binn.* 150. 1 *Hen. & Munf.* 385.) that the affidavit of a juror is not to be received to impeach his

272

verdict, because it would expose jurors to dangerous practices, and to be tampered with by the losing party. In this case, *Anderson* is alleging his own turpitude. He says, that *Mott* and himself never did confer together and disagree, before they appointed *Lydig*, and he avows that he acted with bad faith and duplicity, when he *signed a report, that they *had* compared opinions, and *had* found it necessary to choose a third person, and when he told the parties that they two *had* disagreed in opinion, and when he signed the award, declaring it be " according to his best judgment and belief." Can he be entitled to credit, when he comes now and declares that he acted the hypocrite in all those transactions? It is one of the maxims of the common law, (4 *Co. Inst.* 299.) that *allegans suam turpitudinem non est audiendus.*

3. Another charge of misconduct in the arbitrators is, that they did not examine the premises with sufficient accuracy to enable them to form a correct and just estimate of the value. *Anderson* says this himself, though it does not appear that he made any objection at the time, or required for himself, or solicited from his associates, a more particular examination. *Van Wyck*, the agent of *Van Cortlandt*, is of the same opinion, though he was present at the view of the two appraisers, in *May*, and by all three of them in *July*, and was active in showing and pointing out the state of the works. Some of the by-standers, as the two *Fowlers*, were of the same opinion ; and one of them was surprised that the arbitrators did not make inquiries of him. But the other two arbitrators, *Mott* and *Lydig*, declare that they did make a careful, particular, and satisfactory examination. *Mott* says, that he and *Anderson* examined the works in *May*, for two days, and about two hours each day ; that it was a careful examination, and that the works were examined by all of them, in *July*, with particular attention ; that the works were viewed, at both times, in a careful and satisfactory manner ; and he details a number of particulars. *Lydig* declares the same thing. It was for the arbitrators to judge whether their examination was sufficiently minute and particular to satisfy their minds. It was a matter resting in their sound discretion. It would be impossible for any Court to prescribe *a precise rule on this subject. It must rest entirely in the judgment and integrity of the men selected by the parties. What puts this point beyond all doubt or difficulty, is the fact, that the parties, by themselves or their agent, were present, and conducted the view. They should have directed the appraisers to more particulars, if they wished it, or thought it necessary. They must have deemed the examination sufficient, or they would have pointed to objects for more minute inspection, and have called upon the appraisers

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

[ * 350 ]

[ * 351 ]

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

for a more accurate survey. The appraisers were not only satisfied themselves, but they had every reason to conclude, that the parties were satisfied also. If the parties were not, they should have spoken at the time, when the remedy could have been provided. It is inadmissible to set up the pretext now ; and it appears to me, that no award was ever assailed by a more unreasonable and groundless objection.

4. Another class of objection goes to the legal and technical form of the proceedings.

It is said, that *Anderson* and *Mott* were not duly appointed, in the first instance, because each of them was not selected and appointed by both parties, but each party separately selected a man.

The words of the lease were, that the mills, &c. were to be appraised or valued " by two persons indifferently chosen by the parties, and, in case of their disagreement, by a third person, to be chosen by the two."

Where a lease contained a covenant that the mills and other buildings erected on the premises by the lessee, should, at the end of the [ * 352 ] term, be " appraised and valued by two persons, indifferently chosen by the parties, and in case of their disagreement, by a third person chosen by the two," a nomination by each party of one appraiser, with the assent by each to the nomination of the other, is binding on them, and a compliance with the covenant.

The usual construction of such covenants is the one adopted by the parties, of each nominating a person. The *Van Cortlandts* were the first to put that construction upon the lease, by commencing with the nomination of *Anderson*, and informing the *Underhills* of it : they then, on their part, nominated *Mott*, and no objection being made, by either party, to the person nominated by *the other, the two appraisers were received and acknowledged by both parties, as duly appointed. Under this acquiescence and ratification, the appraisers became " chosen by the parties," within the meaning of the covenant ; and it is impossible that either of them can now be permitted to say that the two appraisers were not properly chosen. A nomination by each, with an assent to each other's nomination, is as reasonable and fair a construction as could have been adopted.

It is, again, said, that the two appraisers had not " disagreed," so as to have been authorized to choose a third person. But it is admitted, that, after devoting part of two days to the inspection of the premises, and conversing together on the subject, the two appraisers told the parties they had disagreed and could not agree : they also signed a writing in which they stated, that they had examined the premises for part of two days, and compared opinions as to their present real value, and found it necessary to choose a third person. What further evidence of disagreement could have been required or given, than the solemn declaration of the appraisers themselves ? It is true, *Anderson* now declares all this to be an imposition and falsehood practised upon the parties ; but can he be heard in such an allegation, or is it worthy of any credit ?

274

After a party has discharged his trust, can he, at any time, vacate all his acts, by declaring that they were not done in sincerity? If this was to be tolerated, there would be no certainty or safety, either in the administration of justice, or in the ordinary business of mankind. But *Mott,* the other arbitrator, contradicts this assertion of *Anderson:* he says, that, after viewing the works, he and *Anderson* did confer together about the value, and did disagree in opinion touching the value; that they mentioned widely different sums, and that there did not appear to be any rational prospect of their agreeing, and so he was led to believe; *and, in fact, that they did not, and were not able to agree.

This testimony puts an end to all further question on this point.

It is further said, that *Lydig* was chosen to assist the other two, and was not chosen as an umpire to decide, independently, by himself, as he ought to have been, according to the intention of the covenant.

The answer to this objection is, that *Lydig* was chosen with the consent and wish of all parties, to act with, and assist the other two appraisers, rather than to act alone. All agreed in that construction of the covenant, and the appraisement was accordingly so conducted. This is a conceded fact, and the parties must be deemed to have concluded themselves, by their own free consent and agency, from setting up any other construction, for the purpose of defeating the award. It would be both unreasonable and unjust. But if *Lydig* ought to have been chosen, and to have acted strictly as an umpire, still the act is valid, for the association of the other two appraisers with him in viewing the premises, in consultation, and in the award, does not vitiate the award by him as umpire. It is settled in the case of *Soulsby* v. *Hodgson,* (3 *Burr.* 1474. 1 *Blacks. Rep.* 463.) that if the arbitrators join in the umpirage, it does not vitiate it. The umpire may take what advice or assessors he pleases. It is still the umpirage of the umpire only. The same observation was made by Lord *Alvanley,* as master of the rolls, that " an arbitrator might make use of the judgment of another, upon whom he could depend, and the valuation of that person is his, if he chooses to adopt it."

There is a charge in the cross bill, though there is none in the answer to the original bill, of fraudulent practices by the *Underhills,* in procuring the award. The charge is, that they covered the cogpit, and part of the raceway, *with boards, and part of the garret floor of the mill with meal, to conceal defects from the observation of the appraisers.

The proof of this charge is to be found in the testimony of *Walter* and *William Fowler.* The first of them states, that

*Margin notes:*
1817.

UNDERHILL v. VAN CORTLANDT.

[ * 353 ]

Where an *um-pire* is elected by two arbitrators, and they join in the umpirage, it is good, for the umpire may take what advice or assessors he pleases.

[ * 354 ]

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

between the first of *May* and *July*, 1813, the *Underhills* covered certain decayed parts of the mill with boards and shingles where it leaked; and the floor on which the water had leaked was strewn over with meal and bran, by *Abraham Underhill*, but whether for the particular purpose of hiding the marks on the floor or not, he does not know. The other witness states, that on the day of the expiration of the lease, *Abraham Underhill* drove some shingles into the roof, it having rained the day before, and the water leaked through upon the floor, and in order to hide the marks, he strewed meal or flour on it, and then had the floor swept; that he laid planks over the plate of the flue, which was decayed, and which had never been covered before, by which means the decayed parts were concealed; that this was done only one or two days before the expiration of the lease; and that, between the 2d of *May* and 8th of *July*, boards were nailed up against the cogpit, though there was an inside door to admit persons into it, which was not fastened.

An objection was made to the competency of this proof. The depositions, though admitted to be read in the cross cause, were taken only in the original cause, which contained no such charge of fraudulent concealments, and, therefore, the proof was *dehors* the pleadings, and not relative to any matter then in issue; and that though the depositions in the original cause were, by a general order, allowed to be read in the cross cause, yet the order never could have intended to render valid such parts of the depositions as contained matter not properly admitted when the depositions were taken.

[ * 355 ]

It is, likewise, objected to the cross bill, that it ought not *to contain new matter, not set up as a defence in the original cause, unless it be new matter subsequently arising; for it is intended only in aid of the defence to the original suit, and cannot be more extensive than the original defence. This is, undoubtedly, the general principle; but I am not clear that the cross bill may not set up additional facts, as constituting part of the same defence, relative to the same subject matter. The first objection strikes me as more weighty; and I am of opinion that, upon sound rule, the matter improperly admitted in the depositions in the original cause, continues equally improper when the depositions are used in the cross cause; and that if the plaintiffs in the cross cause wished to avail themselves of that matter, they ought to have

Proof taken in a cause must be pertinent to the issue in that cause, et secundum allegata.

had the witnesses re-examined. Proof taken in a cause should always be pertinent to the issue in that cause; *secundum allegata*. The opposite party is not to be supposed to have filed his cross interrogatories with any other view; and he

is deprived of the benefit of an examination on his part to such new matter.

I am of opinion, therefore, that all such parts of the testimony taken in the orignal cause, as related to the misconduct of the party, ought to be suppressed : this will leave the charge in the cross bill totally without proof. There were no witnesses examined in the cross cause, except *Anderson*, and he proves nothing on this point.

But if we take this new matter into consideration, *ex gratia*, and in order to view the case in every possible light, how does the proof stand ?

*Abraham I. Underhill*, in his answer, denies that he ever used any means whatever, directly or indirectly, to conceal from the appraisers the real state of repair of the works. He says, that it became necessary to close the business, and clear the mill of flour and other property, so that the premises might be in a proper state and condition for delivery to the lessors, at the expiration of the *term, and as soon as they should be valued, &c.; that the works accordingly ceased to be used, and the milling business was brought to a close, about the last of *April;* that he directed the side of the cogpit to be boarded up, through which persons might otherwise have entered; and the mill was otherwise fully secured to prevent the machinery from receiving injury from evil-minded persons, and to preserve it, and for no other purpose. He says, further, that a short time before the expiration of the lease, and while engaged in repairing the mill, he caused the bridge and platform across the raceway to be repaired, and some boards were laid down, and used in repairing the same, and a passage-way to the gates of the raceway. He denies that any boards or plank were laid down, except as aforesaid, or that the appraisers were thereby prevented from inspecting that part. He further admits, that part of the roof leaked in several places, and that he directed small quantities of bran or shorts to be placed in certain spots or places on the floor, under the roof where it leaked, which had been the constant practice from the time the leaks were discovered, to absorb the water ; and he thinks it probable there might have been small quantities of bran or shorts on the floor, when the appraisers were there ; but he denies, that any thing of this kind was done to conceal the real situation of the roof.

This is a plain and probable solution of the motives which led to the repairs, from which so harsh a conclusion has been drawn. It is to be observed, that neither of the witnesses charge any fraudulent designs in the repairs; and, certainly, the inference of fraud is not a necessary one : it might as well be applied to any repairs whatever, made near

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

If a cross bill contained a charge of fraudulent misconduct in arbitrators, but no such allegation is made in the original bill, though, by an order of the Court, the *depositions* taken in the *original* suit are allowed to be read in the

[ * 356 ]

*cross* suit,—yet such parts of the depositions as related to the fraudulent misconduct, not charged in the original suit in which they were taken, will be suppressed.

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

[ *357 ]

the termination of the lease. The works were still open to public inspection, and the opposite party must have seen and known of all these repairs, at the time of the examination. They were before their eyes, and there was no complaint made, at the time, by the inspectors, to *the opposite party or their agent, of any impediment thrown in the way of a fair and full inspection. On the contrary, *Mott* says that the inspectors satisfactorily examined the machinery in the mill; that the side of the cogpit was boarded up, and which he understood at the time was done to prevent the machinery from being injured, after the *Underhills* had ceased to use it. That he and *Lydig* went into the cogpit below, under the machinery, and viewed it. That there was a bridge or platform across the raceway, and some boards laid down, but nothing to prevent the raceway from being fully examined; and that the inspectors or some of them, did inspect the raceway, as well in that part where the bridge and boards were laid, as in the other part. *Lydig* gives, essentially, the same statement. It would be extremely unjust to draw the conclusion of a fraudulent concealment, from circumstances susceptible of so easy and reasonable an explanation, and which were, at the time, within the view and knowledge of the appraisers and the opposite party, and which were, moreover, not at all injurious; for they did not, in the judgment of the arbitrators, prevent a full and satisfactory inspection.

The only serious part of the charge, according to the testimony of the two *Fowlers*, is the sprinkling of meal on the garret floor, to hide from the inspectors the knowledge that part of the roof had leaked. This really appears to me to be too trivial and too improbable a story to deserve notice. It cannot be supposed that men who had been for many years engaged in great and enterprising business, and whose characters have not, in any degree, been assailed, should have resorted, and that, too, in the very presence of their own miller and his son, to so mean and paltry a fraud, merely to conceal so insignificant a defect as a leak in the roof, and that, too, for the purpose of enhancing the value of their buildings. But the proof here abundantly repels any inference of fraud. *Mott* and *Lydig* both declare, *that while they were in the garret of the mill, they were informed (and one of them says it was by the *Underhills*) that the roof leaked in some places, and their attention was accordingly drawn to the circumstance; and they saw stains on the floor, but nothing to prevent it from being sufficiently and satisfactorily examined. *Anderson* says, he also understood, at the time, that the roof was leaky, and he did not observe that meal was strewed on the floor.

[ *358 ]

6. I come, now, to the real foundation of this controversy, and that is the sum at which the mill and its appurtenances have been valued. The other points on which I have hitherto dwelt, have been seized upon by the dissatisfied party, rather, I presume, as auxiliary to the great object of opening the award, on account of the alleged extravagance of the valuation. The question of valuation of property is, indeed, one on which it is almost impossible to give satisfaction. The judgments of men will differ exceedingly on this fluctuating subject. Lord *Alvanley* has observed, that " valuers differ so much, that it is not very wise to agree to sell according to the valuation of any one." My impression, from the proof is, that the property here was considerably overvalued ; and I have been induced to examine the case with more than ordinary attention, to see if there was any well-established fact that would, upon sound principle, justify me in interfering with the award. But if I have been unable to discover any such sufficient ground, it is then my indispensable duty to adhere to the settled doctrines of the Court, rather than make them bend to a case of individual hardship. I am no more at liberty than any other Court, to follow my own wishes, in opposition to general principles ; nor ought I to give undue importance to small circumstances, or exaggerate trifles, merely to aid a particular case, when, in any other case, it would not be permitted. This case, *like all others, must stand or fall upon the application of the general doctrines of the Court.

It has been made an objection to the damages awarded, that the arbitrators included, in their estimate of the value of the mill, the value of the right which the lessees had acquired of using *Evans's* patent machinery for the manufacture of flour. I cannot perceive any objection to that right being a subject of estimate. The arbitrators were to appraise not only the mill, but " whatever might appertain thereto ;" the machinery erected in the mill under that patent, was protected by it, and the right of using it was an appurtenant, without which the machinery might have been useless. That right must, of necessity, pass with the property in the mill, and whoever succeeded to the right of the mill, took the machinery with it, and the right attached to that machinery. The right was so far, of course, assignable. It belonged to that *machinery, at that place*, whoever might be the occupier. The right must have that construction ; and there is nothing appearing in the case, to show or even to raise a presumption, that the license was useless, or of no legal validity. There is no evidence to show that the machinery erected in the mill, under that patent, was erected between the expiration of the old, and the issuing of a new patent, under the

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

Valuation of property by appraisers chosen by the parties.

[ * 359 ]

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

act of *January*, 1808, or that the case of *Evans* v. *Jordan*, (9 *Cranch*, 199.) has any application. The machinery, we must presume, was, therefore, properly estimated as it then existed.

It is also objected, that the timber cut down and used by the lessees, in the buildings, was not assessed and deducted from the value of the mill and other works; but it is a sufficient answer to this, that the covenant for the arbitration did not extend to any other subject than the mills and their appurtenances. The timber was to be deducted from the *amount* of the appraisement, and not to form a part of it.

[ * 360 ]

The deduction was to be made by the parties, *after the amount of the valuation had been ascertained. Indeed, the *Underhills* assert, that it was proposed by them, that the appraisers should, at the same time, include the timber used by them, and that the proposition was rejected by the other party. Whether this was so or not, it was at least the duty of the *Van Cortlandts* to have tendered proof on that point to the appraisers, if they wished that the timber should have been assessed at the same time. The subject was totally waived by themselves.

Another objection has been raised against the mode of assessment, inasmuch as the appraisers did not, in their deliberations, assess each particular article, in the mill and its appurtenances, separately. But this was a matter resting in the discretion of the arbitrators. There was no rule of that kind prescribed for them, and their judgments were left free to adopt such a mode of valuation as would, in their opinion, lead to a satisfactory result. In fact, the two appraisers, *Mott* and *Lydig*, both declare, in their answers to the charge of this kind, that they did separately value the *items* of the property under appraisement, which were of any magnitude and importance, and sufficiently so to form a correct and just estimate of the whole. In the case of *Dick* v. *Milligan*, (2 *Vesey, jun.* 23. 4 *Bro.* 117.) the same objection was taken. The arbitrators awarded a general balance, but did not set forth particular *items* allowed and disallowed; and the Court say, it was not necessary that the arbitrators should set forth a schedule of particulars, and state all the *items* of an account. If done, it would come to nothing with regard to any thing the Court could do. If they considered them sufficient to determine the result, all was done that was necessary. The matter rested with them, and their judgment was conclusive.

[ * 361 ]

Much testimony has been taken to prove that the mill was greatly overvalued. I shall not enter into the discussion of that part of the proof. Every other point has *been considered with all possible indulgence, and even so much so, 280

that a good deal of testimony has been read and considered, which, upon strict rule, and even upon principles of policy and justice, ought to have been suppressed. But here I think the settled decisions of the Court interpose an insuperable obstacle to the investigation of the question respecting the measure of valuation. Admitting that there was no corruption or partiality in the arbitrators, (and none is pretended,) and admitting that there was no misconduct in them during the course of the hearing, nor of fraud in the opposite party, (and none is established by proof,) then, I say, the Court cannot inquire into the charge of an over or under valuation, or of the reasonableness or unreasonableness of the award, but it is binding and conclusive. If every award must be made conformable to what would have been the judgment of this Court in the case, it would render arbitrations useless and vexatious, and a source of great litigation; for it very rarely happens that both parties are satisfied. The decision by arbitration is the decision of a tribunal of the parties' own choice and election. It is a popular, cheap, convenient, and domestic mode of trial, which the Courts have always regarded with liberal indulgence: they have never exacted from these unlettered tribunals, this *rusticum forum*, the observance of technical rule and formality. They have only looked to see if the proceedings were honestly and fairly conducted, and if that appeared to be the case, they have uniformly and universally refused to interfere with the judgment of the arbitrators.

To show that it is the settled law on this point, it will be useful to review the cases.

In *Greenhill* v. *Church*, (3 *Ch. Rep.* 49.) a bill was filed to be relieved against an award. The Court declared that they would neither confirm nor overthrow such awards, unless circumvention or corruption were proved. This was as early as 1635; and in *Cavendish's* case, which was *before Lord *Nottingham*, (1 *Ch. Cas.* 279.) he declared that if parties, without the Court, refer their differences, they choose their own judges, and the Court would not relieve against the award, unless for corruption, going beyond authority, or the like.

The next case that I shall notice was that of *Brown* v. *Brown*, in 1683, (1 *Vern.* 157. 2 *Ch. Cas.* 140.) which underwent a full discussion. A tenant for life suffered some mills and houses, of the value of 70*l. per annum*, to go to decay, and it was computed that the reparations would cost 380*l. The remainder-man brought an action of waste, and the parties agreeing to an arbitration, it was, by consent, made a rule of Court, but, pending the arbitration, the tenant repaired the waste, and forbid the arbitrators and umpire to

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

If there is no corruption or partiality in arbitrators, nor any misconduct during the hearing, nor any fraud practised by either party, the award is binding and conclusive, and cannot be set aside by the Court, however unreasonable or unjust the award may appear.

[* 362 ]

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

proceed. The umpire, notwithstanding, awarded that the tenant should pay 380*l.* The bill was brought to be relieved against this award, for the excessiveness of the damages and for misbehavior of the umpire. ' The damages were charged to be outrageous, as the repairs made good the decay to within 40*s.* before the award, and the umpire had viewed them. Serjeant *Maynard* opposed the bill, on the ground that fraud or collusion was necessary to avoid an award in equity; and that if awards could be set aside on slight pretences, they might as well strike that title out of the books. The lord keeper, *North,* was of that opinion, and dismissed the bill, though he admitted that the 380*l.* was near the value, in that case, of the estate for life. He said that chancery, in some cases, relieves against manifest error in the body of the award; but where the error does not appear without unravelling it, he thought it was not relievable.

In the case of *Earl* v. *Stocker,* a very few years after, (2 *Vern.* 251. *Hil.* 1691.) the Court set aside an award on one of the excepted grounds, of interest and corruption in the arbitrators; and cases within the reach of the exception were referred to, as that of *Pitt* v. *Dawbra,* where *the arbitrators had promised to hear witnesses, and had made their award without having heard them; and the *Butcher of Croydon's case,* in which the arbitrator was not indifferent between the parties. In all these cases, the award was set aside on the ground of misconduct, partiality, or corruption, and not on the ground of error or mistake; and in *Croydon's* case, the lord keeper declared, that he did not proceed, barely because the damages were excessive, though the award, as it is stated in 1 *Vern.* 157., was for 300*l.*, which was an enormous sum for that day, and was merely to repair, as the award expressed it, the honor of a man who was called a bankrupt knave.

It would be difficult to find cases stronger than these early ones, in favor of the binding nature of awards, when honestly and fairly obtained.

In *Walter* v. *King,* (9 *Mod.* 63.) the bill was to set aside an award for a palpable excess of damages; for the plaintiffs had goods of the defendant to 7*l.* 10*s.* only, and yet he was awarded to pay 36*l.* Lord *Macclesfield,* who was then chancellor, said, he would not set aside the award upon account of any hardship therein, because the arbitrators were judges of the parties' own choosing. A variety of cases, to the same effect, were decided during the time of Lord *Hardwicke.* He declared, repeatedly, that a bill to set aside an award must be founded upon the fraud, corruption, or misbehavior of the arbitrators; that they were judges of the parties' own choosing, and, therefore, they

[ * 363 ]

could not object against the award as an unreasonable judgment; and that whether it was rightfully or wrongfully determined, the parties were bound by it, and there would be no end of controversies if it were otherwise. This was his language in the cases of *Ives* v. *Metcalf*, (1 *Atk.* 63.) *Lingwood* v. *Eade*, (2 *Atk.* 504.) *Ridout* v. *Pain*, (3 *Atk.* 494. 1 *Vesey*, 11.) *Tittensen* v. *Peal*, (3 *Atk.* 529.) and in other cases to which I might refer. *The exceptions, or qualifications to this rule, are mentioned also in these decisions of Lord *Hardwicke*; as, for instance, where the arbitrators made their award clandestinely, without hearing each party, or where one of the parties had himself made use of fraud to mislead the arbitrators. Indeed, the cases uniformly and necessarily allow of relief, where misconduct in the arbitrator, or fraud in the party, are made to appear. (*Spettigue* v. *Carpenter*, 3 *P. Wms.* 361. *South Sea Company* v. *Bamstead*, 3 *Viner*, 139. pl. 39. 2 *Eq. Cas. Abr.* 80. pl. 8. *Burton* v. *Knight*, 2 *Vern.* 514.)

Lord *Hardwicke* was also disposed to extend relief to cases of palpable mistake, as in the instance of a miscalculation in an account, or of a mistake in a plain point of law; and he relied on a decision of Lord *Cowper*, to which he referred. (*Ridout* and *Pain*, 3 *Atk.* 494. *Anon.* 3 *Atk.* 644. *Carneforth* v. *Geer*, 2 *Vern.* 705.) The mistake intended by these cases, is a mistake as to figures, or of one thing, or fact, for another, and does not mean or apply to error of judgment, in its fair exercise upon a subject. Thus, in the subsequent case of *Knox* v. *Simmonds*, (1 *Vesey, jun.* 369.) Lord *Thurlow* observed, that a party to an award cannot come to have it set aside, upon the simple ground of erroneous judgment in the arbitrator, for to his judgment they refer their disputes, and that would be a ground for setting aside every award. There must be something more, as corruption, or gross mistake, either apparent upon the face of the award, or to be made out by evidence; *and in case of mistake, it must be made out to the satisfaction of the arbitrator.* This was done in the case of *Champion* v. *Wenham*, (*Amb.* 245.) where the arbitrators confessed a mistake in two sums, which turned the balance of the account, and the award was so far corrected.

The general doctrine on this subject is laid down, in the most clear and explicit terms, by three of the judges of the Courts of law, while they held the great seal as commissioners. *I allude to Lord Ch. J. *Eyre*, and to the judges *Ashhurst* and *Wilson*, in the case of *Morgan* v. *Mather*, (2 *Vesey, jun.* 15.) In that case, they observed, that it would be a melancholy thing to set aside an award, on matter of fact, because the Court differed from the arbitrators in judgment.

283

1817.

UNDERHILL
v.
VAN CORT-
LANDT.

[ * 364 ]

[ * 365 ]

It is their province to decide facts. The Court does not take upon itself to inquire whether arbitrators have judged right or wrong upon facts. The only grounds to set aside an award are, (1.) That the arbitrators have awarded what was out of their power, as if they award contrary to law; (2.) Corruption, or that they have proceeded contrary to the principles of natural justice, though there be no corruption, as if, without reason, they will not hear a witness; (3.) That they have proceeded upon a mere mistake, which they themselves admit. This case was, afterwards, brought up for rehearing, before Lord *Loughborough*, and he observed, that " all the arguments of the counsel was upon error and mistake; and they had not stated corruption, misbehavior, or excess of power, which were the only three grounds for setting aside awards. If parties agree to refer matters to judges of their own choice, this Court cannot correct the error of their judgment upon facts. One of these three grounds must be made out."

The observation of Lord *Alvanley*, some years afterwards, in the case of *Emery* v. *Wase*, (5 *Vesey*, 846.) was equally strong and emphatical. He said, that arbitrators chosen by the parties ever had, and he hoped ever would have, both at law and in equity, an authority, so that the award should not be overhauled, unless upon fraud, imposition, or gross mistake. Indeed, the law is understood to be so well settled on this subject, that, during the time of Lord *Eldon*, the question, as to the power of relief against the mistaken judgment of arbitrators, seems to have been entirely at rest; and the cases which have occurred before *him, have only related to the means of excluding all partiality, unfair proceeding, and undue influence, from affecting the decision of the arbitrator. (*Walker* v. *Frobisher*, 6 *Vesey*, 70. 9 *Vesey*, 68. S. C. *Fetherstone* v. *Cooper*, 9 *Vesey*, 67.)

In finishing this review of the most material chancery decisions on awards, I think we may safely conclude, that the law is as well settled on this, as on any other subject whatever. The conclusiveness of the judgment of arbitrators has received the uniform sanction of the Court for a series of ages. The rule is not now to be shaken, nor disturbed: it is founded in so much reason and public convenience, as not to be confined merely to the Court of Chancery, but to have met with the general approbation of mankind.

The Courts of law have always been averse to grant any relief in these cases, and the injured party was obliged to resort to equity. In an action at law, on an award, even the corruption or misconduct of the arbitrator is no defence; (2 *Wils.* 148. 3 *Johns. Rep.* 367. 8 *East*, 344.) and where
284

submission to arbitration had been made a rule of the Court of K. B., and the arbitrators were charged with mismanagement in refusing to hear one party, Lord *Holt* made it a question whether the integrity of the arbitrators could be arraigned. (*Morris* v. *Reynolds*, 2 *Lord Raym.* 857.) In this he was properly overruled; but it appears to be settled, that a court of law will not, even where the submission is made a rule of Court, enter into the merits of an award, but will look only to legal objections on the face of it, or such as go to the misbehavior of the arbitrators. (*Lucas* v. *Wilson*, 2 *Burr.* 701. *Chace* v. *Westmore*, 13 *East*, 357.) The statute of 9 and 10 *W.* III. c. 15., and which was adopted by the legislature of this state, in 1791, allowing a submission to arbitration to be made a rule of Court, and to be enforced by attachment, provided for relief in the special case in which the *award shall have been procured by corruption or undue means. This statute contains the legislative sense of the final and conclusive nature of awards, except in the specified case. But though the relief is as much limited at law, and under the statute, as it has been in this Court, yet it was not, as has been suggested, from any disposition to discourage this cheap and speedy mode of settling disputes. In *Hawkins* v. *Colclough*, (10 *Burr.* 274.) Lord *Mansfield* declared, that awards were considered with greater latitude, and less strictness, than formerly, and it was right they should be liberally construed, because they were made by judges of the parties' own choosing.

The *English* law on the subject of awards has, as I apprehend, been adopted very universally in this country. In *Parker* v. *Avery*, (*Kirby's Rep.* 353.) decided in *Connecticut*, soon after the revolution, it was declared by the Court to be unprecedented there to go into the merits of an award, and that the reasonableness or unreasonableness of it did not affect its validity, so that there be no misbehavior or corruption in the arbitrators. The same rule prevails in *South-Carolina*, as appears from the case of *Mulder* v. *Cravat*, (2 *Bay*, 370.) The judges all agreed that too easy an ear ought not to be lent to complaints against awards made by judges of the parties' own choosing, and who possess all the powers of Courts of law and equity in the given case. They said, that the great principle laid down by Lord *Hardwicke*, was the best general rule which could be adopted, which was, that the only ground to impeach an award was corruption, or great misbehavior in the arbitrators, and to which, they thought, might be added, gross mistake or palpable error, though the explanation on that point was not fully given. The same rule has been repeatedly declared in the Courts in *Virginia*. The reasons for setting aside an

award, according to the cases there, must appear on the face of it, or there must be misbehavior in the arbitrators, or some *palpable mistake. (1 *Washington's Rep.* 14. 158. 1 *H. & Munf.* 67. 2 *H. & Munf.* 408.) In one of the late cases, (2 *Munf.* 8.) it was laid down by Judge *Brooke*, that "*whether the value of the land was ascertained upon correct data cannot now be questioned, unless misbehavior in the arbitrators, or some one of them, were proved, or a palpable mistake in the amount, and not in the manner of making up the award, was shown.*" The case of *Davy* v. *Farr*, (7 *Cranch*, 171.) in the Supreme Court of the *United States*, is a strong case to show the caution with which charges of improper conduct in arbitrators ought to be received.

Nor is this general doctrine, on the subject of awards, peculiar to the *English* law, or to the Courts in this country, which have followed its jurisprudence. We find in the civil law the conclusiveness of awards asserted as strongly as in any of the *English* decisions. *Stari autem debet sententiæ arbitri quam de re dixerit, sive æqua, sive iniqua sit, et sibi imputet, qui compromisit.* (*Dig.* 4. 8. 27. 2.) The prætor would not interfere with the decisions of these domestic tribunals, for the very reasons which have been adopted in modern times, because they put an end to suits, and were of the parties' own choice. *Tametisi neminem prætor cogat arbitrium recipere attamen, ubi semel quis in se receperit arbitrium, ad curam et solicitudinem suam hanc rem pertinere prætor putat : non tantum, quod studeret lites finiri, verum quoniam non deberent decipi, qui eum, quasi bonum virum disceptatorem inter se elegerunt.* (*Dig.* 4. 8. 3. 1.) But the civil law afforded a remedy against the award, if it was procured by fraud and corruption, *posse cum uti doli mali exceptione.* (*Dig.* 4. 8. 32. 14.) The observation of one of the civilians, under this title, lays down, with precision, the rule and the exception, the conclusiveness of the award, with the exception of fraud in the arbitrator or the party. *Partes aut stare debent sententia, sive æqua, sive iniqua sit, nisi *dolus partium aut arbitrorum arguator.* (*Hub.* lib. 4. tit. 8. § 7.) I will dwell no longer on this subject, than merely to refer to a case stated in the *Institutes*, which is very much in point. If it is agreed that a thing be sold at a price to be fixed by a third person, *quanti ille æstimaverit*, the agreement is valid, and the price fixed by the arbitrator must be paid. (*Inst.* 3. 24. 1.) But *Vinnius*, in his commentary on this passage, qualifies the award with this exception: *Ergo etiamsi Titius arbitrator multo pluris aut minoris rem æstimaverit, quam valet, dicendum est valere contractum. Sane si arbitrium Titii tam pravum est, ut manifesta ejus iniquitas appareat, consentiens fere omnium opinio est, arbitrio boni viri*

286

*iniquitatem corrigi posse.* The case here stated is the very one we are considering. The parties choose arbitrators to fix the price of the mill, and they must abide by the price declared, be it too high or too low, unless fraud can be shown. This award would be declared binding by *Vinnius,* sitting under the civil law; it must be equally so under the law of this country.

Before I conclude, I ought to take notice of an objection that was raised to the jurisdiction of the Court. It is said that the *Underhills* ought to have pursued at law their remedy upon the award, as it was simply for the payment of money, and no account is sought or called for. To this it is answered, that the omission of the complainants in the original suit to sign the lease was a mistake that rendered it necessary to seek their relief here, and that their right arises partly as assignees of a *chose in action,* on which they could not have had a suit at law in their own names. The reasons are, probably, of themselves, sufficient; but, at any rate, by answering in chief, instead of demurring, the defendants submitted the cause to the cognizance of this Court, and they come too late, at the hearing on the merits, to raise the objection. It would be an abuse of justice, if the defendants were to be permitted to protract a litigation *to this extent, and with the expense that has attended this suit, and then, at the final hearing, interpose with this preliminary objection. Such appeared to be the opinion of the majority of the Court of Errors, in the case of *Ludlows* v. *Simond,* (2 Caines's Cas. in Error, 40. 56.)

Where a defendant puts in his *answer,* instead of a demurrer, and the cause comes on to be heard on the merits, it is too late too object

[ * 370 ]

to the *jurisdiction* of the Court, on the ground that the plaintiff might have pursued his remedy at law.

I shall, accordingly, decree, that the plaintiffs in the original suit recover the sum awarded; that there be a reference to a master to take an account of the value of the timber as it was when standing, which was cut on the premises, and appropriated towards building the mill, and its appurtenances, according to the provision in the lease, and also to take an account of the assets, real and personal, of the estate of *Pierre Van Cortlandt,* deceased, and which came to the hands of the defendants, as his representatives; and that all further questions be reserved until the coming in of the report.

Before I close, I must briefly observe upon a recent occurrence in this case. As my opinion was about to be delivered, on the 20th instant, the counsel for the defendants, in the original suit, presented a petition, in which they offered, in lieu of the sum awarded, to release, in fee, to the plaintiffs, the premises, together with such a quantity of adjacent land as the Court should deem reasonable and requisite to the full enjoyment of the mills, &c. This proposition was altogether distinct from the controversy before

1817.

ATT\ GEN'RAL
v.
UTICA INS. Co.

me, and was not contained in the pleadings, or proofs, or suggested upon the argument, and I did not feel myself authorized to act upon it any further than to suspend the decree, until the counsel for the plaintiffs had communicated the proposition to their clients, and obtained their answer. That answer, I understand, is now received, and the offer is declined, for reasons which are mentioned, but with which have nothing to do. Whatever my opinion, or wishes, may be, I consider that terms of accommodation rest exclusively with the parties. If the proposition had been made

[ * 371 ]

in the first instance, at the publication of the award, *and had been inserted in the pleadings, it would have been regularly before me as part of the case ; but it comes too late at the very close of the controversy. I must decide the cause upon the pleadings and proofs.

Decree accordingly.