DAVID CARLISLE and JAMES McDOWELL, Jr. and HANNAH, his wife, late HANNAH HARPER, complainants below, appellants. *vs.* THOMAS FLEMING and HANNAH his wife, late HANNAH CAR-LISLE, MARY CARLISLE, JOHN C. HUTTON and MARY his wife late MARY HARPER, ANN HARPER and JOHN W. THO-MAS, adm'r. of SAMUEL CARLISLE, dec'd. respondents.

The ground on which equity compels a specific performance of a parol agreement concerning lands is the *prevention of fraud.*
When part performance is relied on as taking a case out of the statute, the acts must be unequivocally in execution of the agreement.
And the terms of the agreement must be clearly proved.
On a promise by a father to one of his sons that if he, the son, would continue with him, he would leave him the farm at his death, the court refused to decree a specific execution against the heirs at law on the ground of an agreement performed by the son.

APPEAL from the decree of the chancellor. New-Castle County.
The case, as presented by the complainant's bill, was: That about the year 1811 the complainant, David Carlisle, resided with his father Samuel Carlisle, on a farm lying partly in this state and partly in Pennsylvania, containing about 190 acres, and of which the said Samuel Carlisle was the legal owner in fee; that the said David Carlisle being of full age was desirous to establish himself as a farmer on his own account, but the father, being a person of small means, and wishing his assistance in the cultivation of his farm represented that it would be more advisable for him to remain and devote himself to the improvement of it; "promising that in case he took this course, he should be owner of it, after the death of him the said Samuel, and that he would make his will to that effect. And that confiding

in this promise, he David *consented to remain*, and from that time up to the year 1820 he and his father resided in the same house, and he devoted his whole time, labor and exertions to the cultivation of the farm and that during that period he received no other emolument than his support and clothing, looking forward to the performance of the promise of his father, which he frequently repeated, during the time he lived with him. That at the beginning of 1814, he married and the property he received by his wife, of the value of about one hundred and fifty dollars was applied to his father's benefit, and the services of his wife rendered without any emolument, other than her support. That his father becoming less disposed to pay any attention to business, in April, 1820, removed to a small house on the farm, and that at the time of his (David's) so taking charge entirely of the farm, *it was in a very unimproved condition, and a large portion of the land a common.* But induced by the understanding of an arrangement existing between him and his father, that the farm should be devised to him; he went on to improve it, and at the death of his father he had brought it into a high state of cultivation and more than doubled in value. That among the improvements, he mentions a number of buildings, and the burning and spreading over the farm eight kilns of lime beside other manure. That he fenced in all the farm lying as a common and paid the taxes assessed upon it, and that all was done by him, and by means acquired by him, and without any assistance from his father. That during all this time his father and family derived their support from him except for about six years, and that he (David) supplied his father with money to pay of his debts, to an amount not less than 2500 dollars, and that his father had no other means or property, but that which was supplied by said David. The bill then proceeded to state, that his father intending to fulfil and comply with the promises made by him, and with the understanding and arrangement between them caused his last will and testament to be written on or about the first of December, 1830, and that thereby subject to certain charges and exceptions, devised all his real estate to David; that the said Samuel Carlisle signed the same, but it was not executed in the presence of any attesting witnesses, admitting that it is void and of no effect in this state as a will, but that Samuel Carlisle believing the same to be good and sufficient to vest in the persons to whom he had devised his property their several interests as therein written, took no further step in order to give effect to the agreement between him and David, and died on or about the first day of January, 1832, without making any other will, with the belief that the writing he had signed as his will was good and sufficient as a last will and testament. There was no prayer in the bill for a specific execution of the alledged agreement by means of any conveyance of the farm, but the prayer was for an account, and that the farm may be sold for payment of the balance which may appear to be due, and for general relief. The defendants having an interest in the farm, admitted the seisin and possession thereof, in 1811, of Samuel Carlisle, and that he continued upon it until his death, but they precisely and positively deny that he made the promises to David as set forth in the bill. They say that David, after he became

of age, contiuned with his father, and was maintained by him until his marriage in 1814, and that after his marriage, he and his family, continued to live with his father until 1820, but deny that he was entitled to receive any thing for his and his wife's services, other than what he received by way of support from his father, and deny that the property received by David with his wife was ever applied to his father's benefit. They say that about 1814, Samuel Carlisle sold to Thomas Fleming, one of the defendants, and his son-in-law, 40 acres of land or therebouts, part of the said farm, and that Fleming proceeded to build on the same a dwelling house but before it was completed, the agreement was rescinded, and the expenditures therefor repaid, and that the said building was finished by Joseph Harper, another son-in-law of the old man, and that the said Harper with his family occupied the same from 1815 until 1820, when Samuel Carlisle removed to this house with his family; David and his family continuing in the house in which the two families had been living. That from that time, till the death of the old man, David tilled the farm (except about 6 or 8 acres,) and took to himself the profits of the same. The answer then enumerates a variety of articles of personal property which remained with David, and which amounted in value to about 2000 dollars, and they deny that David went on to improve the farm under the understanding and arrangement set forth in the bill. They say that the buildings were made of materials belonging to his father, and that whatever lime was spread, was of lime stone from the old man's quarry, hauled by his own teams, and burnt in his own kiln with his own wood and principally by his negroes. They deny that David paid the taxes, and say that whatever he did was only as a tenant, in which relation they say he stood as to said farm with Samuel Carlisle. They deny that David supplied his father with money to pay of his debts—that he was destitute of means or property to pay them, or to support himself and family;—do not believe he was indebted exceeding 400 dollars at any one time previous to building his barn in 1820, and since then, not exceeding 500 dollars. Refering to the instrument signed as a will, they aver their belief that fraud and concealment have been practised by David and a confederate whom they name. They state that the old man made and executed divers wills, and some of them in the presence of subscribing witnesses; and that he thereby made different dispositions of his estate. They insist that the complainants are not entitled to any relief in chancery, and that a court of law is open to David Carlisle against the administrator, and that the whole is barred by the act of limitations, the benefit of which they claim.

On the hearing of the cause below the chancellor dismissed the complainant's bill with costs, whereupon, an appeal was prayed and granted.

The cause was by consent argued in this court in writing by Mr. J. A. Bayard for the appellant and Mr. Rogers for the respondents.

The complainants insisted that the decree of the chancellor should be reversed and one of two kinds of equitable relief granted to him: First. That the will of Samuel Carlisle, though void as a *mere will* ought to be established against the defts. as an instrument which the

agreement of Samuel Carlisle with David, founded on a valuable consideration and performed on David's part, bound him to execute. Second. That in case the court should consider the agreement not sufficiently definite to call for a decree establishing the will David Carlisle was entitled to remuneration for his services and sacrifices in the performance of his part of the said agreement with his father and to a decree for an account.

The first ground, it was argued, presents the ordinary case of the specific performance of an agreement. To call for this, all that is necessary to be shown, is, the terms of the agreement, the consideration and the performance or readiness to perform his part by the party seeking relief, and that either the agreement (if it relates to land) was in writing, or has been performed in part. In this case there is no written agreement, but an entire performance by the complainant of his part of it. It is submitted that it is proved that Samuel Carlisle agreed with David in consideration of David remaining with him and assisting him in the cultivation of the farm during his life he would leave the farm to him at his death. Samuel Carlisle was competent to make such an agreement and there is nothing in the relation of parent and child to forbid it; on the contrary, the consideration of blood is a good consideration, and the *slightest* valuable consideration added would call for its enforcement in cases where as between strangers the consideration would be deemed inadequate for the purpose of the interference of a court of equity. And it can be no objection that the agreement of Samuel Carlisle was to be performed by a *will*. A man may agree with a stranger to convey property by his will, and if his agreement is founded on a valuable consideration performed by the other party, though he makes no will a court of equity would compel a conveyance of the land by his heirs, because being founded on a valid agreement for a valuable consideration, the will is no longer a *voluntary* act. The case of *Goilmere,* vs. *Battison,* 1 *Vernon,* 48, is conclusive as to this, and far weaker either as to the proof of the agreement or the extent of the consideration, than the principal case. The heirs claim always as volunteers, and subject to all debts and valid agreements made by the ancestor, as to the descended lands. In the case cited the agreement was decreed specifically against a husband, who, though no purchaser, stands as to his marital rights on higher grounds than mere heirs. It can make no difference in such a case, whether the will is not made from intention, from negligence or accident. The ground of specific performance is, that a party, having received the consideration of the agreement, is bound to perform his part of it, and the obligation extends to all persons claiming under him as volunteers. How do these principles of equity apply to the present case? The *promise* of Samuel Carlisle to make a will in favor of his son, cannot be doubted, and his competency to make that promise. Is the consideration adequate? and has there been such a part performance as to supply the want of a written agreement? As to the latter question, it is believed to be established, that David Carlisle did remain with his father and assist him in the cultivation of the farm, until his death; that he was the most efficient person on the farm until 1820, and from that time had the entire charge of it; and

that he devoted his time and labor and that of his wife in the cultivation and improvement of the farm in the support of his father's family and in the payment of the old man's debts. This is, therefore, an entire performance by the complainant of his part of the agreement. Is not the consideration sufficient? In our country in *fact* as well as in the eye of the law the time and labor of every industrious man is worth more than a mere support of himself and family; but whether worth more or not, the agreement in this case estimated them as worth more, and entitled the son for his services during the life of the father to the land at his death. There is one authority as to both the sufficiency of the consideration and the right to relief in equity, which appears to be very applicable. *Scotis Ex'r. vs. Osborne's Ex'rs. 2 Munf.* 413. "A father-in-law having promised his son-in-law that if he would purchase a certain tract of land he would assist him in paying for it by letting him have the amount of a particular bond when collected, and the son-in-law having thereupon made the purchase, this was determined to be upon sufficient consideration and obligatory in law. It was objected in the court below that the complainant's remedy was at law, on his own showing. I cannot see the force of the objection. In *every* case of *specific performance* of an agreement, the party has a right of action at law, but the remedy is not sufficiently ample. If we are entitled to compel a conveyance of the land by the heirs, on the foot of an agreement for valuable consideration made with the ancestor, that clearly is a ground for coming into chancery. Damages for non-performance are not considered in equity as sufficient relief where the contract is capable of specific execution, especially where there has been an entire performance by the party seeking relief. And this objection comes *too late;* it ought to have been by demurer. The objection, if valid, appears on the face of the bill, and does not arise from any new matter. In *Underhill,* vs. *Van Courtlandt, 2 Johns. Ch. Rep.* 369, it was decided that when a "defendant puts in his answer instead of a demurrer, and the cause comes on to be heard on the merits, it is too late to object to the jurisdiction of the court on the ground that the plaintiff might have pursued his remedy at law." In reference to the case as one of specific performance, it may be objected that the bill does not pray a conveyance by the heirs of Samuel Carlisle. The objection is not valid. There is a prayer for general relief, and under that prayer the complainant is not confined to the particular relief prayed for in the bill, but is entitled to such a decree as the circumstances of his case may require. Vide *Johns. Rep.* 529 *Bebee* vs. *Bank of New York.* If there is any doubt on the proof as to the existence of the agreement, the court would send an issue to law, to try the question.

Second. The principle on which relief is claimed independent of any positive agreement is, that whenever a party by his own voluntary act or declaration acquiescence or concealment occasions a loss to another which he would not otherwise have sustained, he shall not be permitted in equity to derive advantage from his own default or neglect, though no action would lie at law for damages. The principle seems necessarily included in the word equity, and is supported by the fol-

lowing authorities. 2 *Vern*. 506, *Oldham* vs. *Litchfield; Prec. Chy*, 5; *Devenish* vs. *Barnes; Sel. Cha. Ca.* 5. 9; *Teasdale* vs. *Teasdale*; 2 *Freeman*, 34; *Chamberlain* vs. *Chamberlain;* 1 *Anst.* 185; *Hardcastle*, vs. *Shapton;* 2 *Vern*. 150; *Hunsden*, vs. *Cheyney*, 1 *Vernon*, 136; *Thobbs* vs. *Norton, &c. Gil. E. Rep.* 85; *Kanning* vs. *Ferrers.* On the principle recognized in these and numerous other cases, we conceive ourselves entitled to a decree for an account in the principles stated in the prayer of the bill.

In the argument on the part of the defendants, it was insisted that no agreement had been proved to have been made between Samuel and David Carlisle as set forth in the bill; that nothing had been proved more than general declarations of intention or indefinite promises by the old man, to leave the farm to David; that such promises were voluntary and without consideration; that the residence of David with his father was for his own benefit, as he was in the receipt of all the issues of a valuable farm, in return for his own services and those of his wife, by which he had become largely a debtor to his father's estate, and that he so remained with his father for his own present advantage, and relying on the final voluntary performance of his father's intentions as to his will. The first species of relief asked for in the complainant's argument, by way of specific performance of the alledged agreement, was resisted; First, Because no such case was presented or relief sought in the bill, nor was such a ground of relief presented to the view of the chancellor at the hearing in the court below. Had such a case been presented by the bill, the course of defence would have been materially different. Had there been a prayer for specific performance, the defendants would have answered that such a matter was not within the jurisdiction of a court of equity as to set up a defective will in performance of a supposed agreement, because the effect and validity of the said pretended will was a matter properly triable at law; or the def'ts. might have demurred; which they could not do to the general prayer of the bill. By setting up a claim for specific performance, at this stage of the cause, the def'dts. are deprived of defence by way of demurrer, on the ground of want of consideration, which appears on the face of the bill, and would have been fatal on demurrer to the demand for specific performance. Again, the def'ts. might have pleaded to such a case, if it had been presented by the bill, the statute of frauds and perjuries; for it is not pretended that the agreement was any thing more than a parol agreement which is void by the statute; nor is there any thing to take it out of the statute, for it is believed that no case can be found in which the specific execution of an agreement by parol has been decreed where the same has not been supported by written testimony wherein the terms of the agreement are set out. 2 *Equity, Ca. Ab.* 47, *p.* 15; *Prec. Chy.* 526; 5 *Vin. Abrig't.* 521, *Pl.* 32. And no acts of part performance will take a case out of the statute unless they place the complainant in a *situation which is a fraud upon him,* unless the agreement be specifically executed. The terms of the agreement as set forth in the bill are too indefinite and uncertain; the *essence* of a contract was wanting; there was no *obligation* on the part of David to remain; and the testamentary disposition of his property by the father was *voluntary,* the nature of the

services; the extent of the improvements; the receipt and disposition of the annual issues and proceeds of the farm, and the *consideration* for the alledged promise, are all left uncertain and indefinite. In short, a case of specific performance is neither stated nor proved, and could not have been decreed even if prayed for, much less can the complainant have a decree for a specific performance under a prayer for general relief. Equity will not interpose to compel the performance of a *voluntary* agreement entered into without fraud. 1 *Atk.* 401; nor where there exists a power of revocation, (18 *Vezey* 99) and it is clear that such a power existed in Samuel Carlisle in this case. 4 *Vezey, Jr.* 23; 2 *Bro. Chy* .140; 1 *Vezey, Jr.* 199; 12 *Vezey*, 69; 8 *do* 159; 14 *do*. 386; 19 *do* 479; 2 *Cox. Ch. Ca.* 271; 2 *Atk.* 83.

Second. The second species of relief asked for proceeds on the principle that where a man by his conduct occasions a loss to another, he shall not be permitted in equity to derive advantage from his own default, though no action at law would lie for damages. All the cases cited are in reference to personal estate, except that of *Devenish* vs. *Barnes* which turned upon the *custom* of the country by which the estate could be created by *parol;* and they all proceed on the principle of direct and obvious *fraud.* In this case there is neither allegation nor proof of fraud; if there ever existed any promise on the part of Samuel Carlisle it was upon that, as a mere engagement of honor, that David rested his hope of obtaining the farm at the old man's death; and it is submitted that, nice as the doctrines and principles of equity may sometimes be, a court would be much more perplexed by the delicate questions involved in the analysis of a merely honorable engagement. Nor, if the promise had been one upon which a legal obligation could be founded, was there any consideration to support it. The services performed by David, both in kind and extent, depended on his own will, and were liable at all times to be withdrawn; and they were more than compensated by the support for himself and family which he derived from the farm. If they were not, however, and he still has a demand on the estate of his father for services rendered, this is not the subject of a suit in equity, but he has ample remedy at law. And this is a full and flat answer to this branch of the case, whether made by demurrer or on the hearing, if the case turns out to be one of a mere legal demand equity *cannot* afford relief. Equitable claims only *can* invoke the interference of equity.

In the argument in reply Mr. Bayard insisted that it was not necessary that the relief by way of specific performance should be specially prayed for in the bill; and he relied on the case cited of *Bebee* vs. *Bank of New-York,* and the case of *Hollis* vs. *Carr,* 2 *Mod.* 91, where a covenant to levy a fine was *specifically* decreed under the *general* prayer for relief. A court of equity abhors technicalities; and the true principle is, that if the *statement* of the case sustained by the proof entitles the party to relief other than that prayed for it will be granted under the general prayer. It is denied that the *effect* and *validity* of a will is a matter triable only at law; the fact of will or no will, devisavit vel non, is triable only at law; but the construction of a will or its effect may be decided in whatever court

a question is raised upon it.   We here *admit the will to be void*, but we say that, as by his *agreement* Samuel Carlisle was bound to make a valid will, whether he fails to do so by accident, negligence or design, equity will enforce the agreement against his heirs and compel a conveyance of the land.   The defendants were not prevented from demurring to the *case stated in the bill* if they had thought proper to do so, and the idea of a demurrer to the *prayer* for want of equity is a novelty in equity practice.   If the bill discloses *any* ground of equitable relief a demurrer will not lie; the *extent* and *nature* of the relief are to be determined at the hearing. As to the defendants being deprived of the plea of the statute of frauds by the general prayer of the bill, it is perfectly immaterial to them; for where a defendant denies a parol agreement it is incumbent on the complainant to prove one not within the statute, or if within it for want of writing, that it is taken out by part performance or fraud.   That this is a case so taken out has been argued, first, by the labor and services of David Carlisle performed on his part, which was the consideration of the promise; and secondly; if not viewed as an agreement, that the advantage of that labor was obtained by a promise to a child not performed and which on the ground of *prevention of fraud* ought to be enforced.   The case cited from *5th Viner*, 521, has no analogy to this case.   It was the case of a naked *parol* agreement in *no part* performed.   Here the *entire* consideration was performed by David Carlisle; and we are willing to adopt the principle advanced by the other side, "that it is only where the act of performance places the complainant in a situation which is a fraud upon him, unless the agreement is executed."   On that principle we consider ourselves entitled to a decree for a specific performance.   The agreement is said to have had no obligatory force on either of the parties.   The continuance of David was sufficiently secured by the fact that the remuneration of his services depended upon it; and as it regards the father, though the making of a will is generally voluntary, it was not so after the agreement for a valuable consideration to make it in a particular way, it was then neither voluntary nor revocable, but obligatory.   So far from all the cases cited by the complainant being in reference to *personal* estate, *Oldham* vs. *Litchfield*, *Teasdale* vs. *Teasdale*, *Hardcastle* vs. *Shapton*, *Hobs* vs. *Norton*, and *e contra* and *Kanning* vs. *Ferrers* are all cases relating to *real* estate.

The next position, stated with so much confidence, that the claim if good is relievable at law, has been anticipated in the former argument, and the authority, high as it deservedly is, there cited, remains unnoticed; with the presumption, I take it for granted, that the dictum of the defts'. counsel is to outweigh the authority of James Kent.   I am willing to abide the result.   If the case is one founded on an agreement of which we are entitled to call for a specific performance the relief is at equity alone; if it is simply the case of a promise by Samuel Carlisle not performed, by virtue of which there arises counter claims on each side as stated in the bill, then there is sufficient ground to ask *an account* from a court of equity.

At the June term, 1835, *Judge Robinson* delivered the opinion of the court.

After stating the case at ante pp. 421, &c.

"It was insisted on in the argument for the appellants which was drawn up with much skill and ability, that the decree of the chancellor should be reversed by this court, and that one of two kinds of equitable relief should be granted to David Carlisle, who is the only appellant claiming any interest in the farm which is the subject of controversy, as the other appellants have conveyed all their interest in it to him. The first kind of relief it is said, presents the ordinary case of a specific performance of an agreement, to wit: "that the will of Samuel Carlise, though void as a mere will, should be established against the defts. as an instrument which the agreement of Samuel Carlisle with David, founded on a valuable consideration and performed on David's part, bound him to execute." The other kind of equitable relief is the same as that prayed for in the bill, for an account. The first question to be considered is, has the agreement stated in the bill, or any agreement been proved, against the positive denial in the answers of any agreement having been made. Mary Carlisle, the widow of Samuel Carlisle, and a witness produced by David, in her answers to the fifth interrogatory says, "that when David came of age, he told his father that the farm was so poor that he must leave it, unless he purchased a lime quarry for the purpose of improving it; that his father, at that time; and frequently afterwards, gave David to understand, that if he would remain upon the farm and improve it with a view to the payment of his debts, which were then heavy, he would leave him the farm at his death, but that he would keep the reins in his own hands while he lived." And in her answer to the 26th interrogatory she deposes "that Samuel Carlisle frequently expressed his regret, that David was obliged to work so hard to pay his debts; that he and his wife had made themselves slaves for him, and that he wished to see his debts all paid that he might leave his farm to David, as he had earned it." Sarah Wilson another witness adduced for the complainants, deposed "that when David came of age he was about to go away; that at that time, and frequently afterwards, she had heard Samuel Carlisle tell David that if he would remain upon the farm and improve it, that it should be his when he died." These are all the witnesses on whom the appellant, David Carlisle, relies to prove the agreement. It is proved in other portions of the testimony that David came of age in October, 1809, so that he had been at work for his father two years before the time when he represents the agreement to have taken place; whilst these two principal witnesses state the first conversation on the subject to have taken place when David came of age. The bill in order to show an agreement states, that David consented to remain, but neither of these witnesses prove any such thing, or that he agreed or consented to do any thing. It appears that the only condition that David imposed, to induce him to remain in order to improve the farm, was the purchase of a lime quarry, for he introduces the conversation himself, according to the testimony of his mother, by telling his father "that the farm was so poor that he must leave it, unless he, (the old man) purchased a lime quarry." The frequently

repeated declarations of the old man of his giving David to under-stand, or of his telling him if he would remain and improve the farm that he would leave it to him at his death, very much weaken the probability of any mutual agreement having been concluded on. Here then is clearly a want of mutuality, for if the old man fre-quently gave David to understand, or made promises, it is not proved that David was under any engagement to remain, or to de-vote himself to the improvement of the farm during his father's life-time, or any time at all. He could have left the farm when he pleased, without violating any contract. In *Bromley* vs. *Jeffries*, 2 *Vern*. 415, the case was that Sir Rowland Berkley, on the mar-riage of the plff. with one of his daughters, covenanted that if the plff. survived Sir Rowland and had issue by his daughter, that the plff. should have a manor fifteen hundred pounds less than any other purchaser would give for the same. The court refused to decree a specific execution on two grounds, and one was, that the agreement was not mutual, as the plff. was not bound to take it at any price. David Carlisle was not bound according to any proof in the cause to remain and improve the farm. So in *Cook* vs. *Oxley*, 3 *Term Rep.* 652, it was decided that as the engagement, at the time it was en-tered into, was all on one side, it was nudum pactum, for want of mutuality. Then is the instrument of writing of the 30th Decem-ber, 1830, sought to be established, for a specific execution of the agreement, such an instrument as Samuel Carlisle was bound to exe-cute, or in other words sufficient to take this case out of the act of assembly which declares "that no action shall be brought to charge any person upon any contract, or sale of land, unless the same shall be reduced to writing, or some memorandum or note thereof shall be signed by the party to be charged therewith, or some other per-son thereunto by him or them lawfully authorized." The grounds on which courts of equity compel a specific performance of a parol agreement is that of fraud in refusing by one party, after the other has performed, and in some cases partly performed, on his part. But in this case no fraud has been imputed to Samuel Carlisle, but on the contrary, it is admitted that by the instrument of writing referred to he intended to fulfil his promise, and believed it to be sufficient as a will. In some cases it has been held, that relief ought not to be decreed on the ground of fraud, if it is not put in issue by the pleadings. 6 *Johns. Rep.* 554. But the remedy sought to be obtained by this appeal is not so much the ordinary case of a specific performance of an agreement on the ground of fraud, as to supply the defective exe-cution of an instrument as a will, on the ground of mistake, a mis-take as to a legal formality in omitting to have two or more attesting witnesses to the execution of the instrument as required by law to make it a will. For it is alledged that Samuel Carlisle believing it to be good and sufficient to vest in the persons to whom he had de-vised his property their several interests as therein written, took no further step in order to give effect to the agreement as set forth in the bill. If the agreement had been proved, and if the instrument had contained in it only such provisions as would have satisfied that agreement, there is no doubt that a court of equity could afford re-lief by carrying into execution the provisions of the instrument. But

by the agreement as mentioned in the bill, David was at the death of his father to be entitled to the whole of the farm, without any exceptions or charges, and as a purchaser for a valuable consideration, wholly to be performed in his father's life time.   But in this statement now sought to be established to fulfil an agreement, Samuel Carlisle had no intention to comply with any contract or legal obligation, but to make voluntary donations to all those who from a moral obligation only, he considered entitled to his bounty.   Thus he intended to devise portions of the farm to his wife, his daughter Hannah, and to his grandson Samuel Carlisle.   He intended to give to his wife and her heirs a road through any part of his land, and to her and the Baptist church, fire wood to be taken from the farm, and David was to pay sixty dollars per annum to his mother during her lifetime, and five hundred and fifty dollars legacies to three children of his daughter Nancy Harper, two of whom were not born when David came of age.   Subject to these provisions and others, he intended to devise the farm to David in fee, but failed in the proper execution of the instrument to make it a will.   There is therefore such a discrepancy between the alledged agreement and the intended will, that if the former had been proved the latter could not with propriety have been established or taken to be in performance.   It could not be said to be such an instrument as Samuel Carlisle had bound himself to execute, and therefore a court of equity could not supply its defective execution on the ground of mistake.   But it has also been insisted on, that the acts done by David, his services in the improvement of the farm, in the support of his father, the payment of his debts, and the erection of buildings, were in part performance of the alledged agreement.   In *Ambler,* 586, the chancellor observed that "in all those cases where the ground of the decree has been part performance, the terms of the agreement must be certainly proved.   And as to the acts done in part performance they must be such as could be done with no other view or design than to perform the agreement, and that in that case it did not appear but that the acts done might be done with other views."   We have already stated that it has not been proved that David had agreed to remain on the farm to improve it or to do any thing; but supposing the agreement had been proved, do the acts done by David necessarily show them to have been done in part performance.   Delivery of possession is considered as part performance, especially if money be expended in building according to the agreement, but the possession must be delivered in part performance, for if it can be referred to a title distinct from the agreement, it will not take the case out of the statute.   As where a tenant continues in possession, it is not deemed a part performance, for a tenant of course continues in possession, unless he has notice to quit, and the mere fact of his continuing in possession cannot have any effect.   According to the allegations in the bill of the terms of the agreement it was no part of the understanding that David was to have the exclusive possession of the farm before the death of his father, or that he was to erect costly buildings on the farm, and pay for them out of the profits of the farm, or that he was to pay his father's debts and taxes in the same way, or that he was to supply his father with money from the same source, or

furnish. him with the means of support, or that his wife's services, or the property he received by her were to be applied to the benefit of his father, therefore the doing or performing of these acts cannot be taken as part performance. Neither can David's continuing to manage and devote himself to the cultivation of the farm, and to the improvement of it, from the time he states the contract to have been made be considered in part performance, because like the case of the tenant he was only continuing in the same relation in which he had stood to his father for many years before, to wit, from the time he became of full age and long before. From the deposition of Mary Carlisle it appears that the object of the old man was the improvement of the farm, with a view to the payment of his debts. For this she refers to what the old man said when David came of age in 1809, and yet according to the admission in the bill, it appears that in 1820, eleven years afterwards, the farm was in a very unimproved condition, being much impoverished by long cultivation, without manuring, and the fences in bad condition, and a large portion of the farm a common; notwithstanding the lime quarry had been purchased several years before, and that from the year 1811 up to the year 1820 David's whole time labor and exertions were devoted to the cultivation of the farm and under his direction; and such deficiency on his part took place when according to the proof in the cause he had an ample force under his direction to enable him to have placed the farm in the best state of improvement. Beside all this the alteration of David's situation by his marriage in 1814, and his raising a family of children in the old man's family, his purchasing and owning horses, oxen and other property, all paid for and fed out of the products of the farm, and his exercising the right to go and return when he pleased, together with the important fact of the old man's having sold a portion of the farm to Fleming his son-in-law, and of Fleming erecting, at his own expense, a dwelling, without any objection from David, all taken together are sufficient to have prevented the chancellor from affording relief by decreeing a specific performance. As to decreeing an account with a view to compensation to David Carlisle for the services of himself and his wife, it appears to the court that if he be entitled to such compensation, he has ample remedy at law. It therefore does not seem necessary or even proper for this court to express any other opinion in regard to this part of the case.

Decree affirmed with costs and record remanded.

*J. A. Bayard,* for appellants.
*Rogers,* for appellees.