## CUTTING *vs.* DANA.

1. Though, in general, the Court of Chancery will not entertain a bill for specific performance of contracts for chattels relating to merchandise, but will leave the party to his remedy at law, yet, notwithstanding this general distinction between personal contracts for goods and contracts for lands, in some cases, equity will enforce contracts for personal property.

2. Where the complainant has not a clear, complete and adequate remedy at law, or where some other ingredient of equity jurisdiction is mixed up in the transaction, equity will interfere to decree specific performance of a contract for the sale of a debt.

3. An objection that the complainant has a complete and adequate remedy at law, comes too late at the hearing.

4. Although the court may, of its own accord, dismiss the bill when it appears on the hearing, that the complainant has a complete and adequate remedy at law, notwithstanding the objection was not taken in the pleadings, nor noticed in the argument, yet, under such circumstances, it is the duty of the court to retain the cause, provided it be competent to grant relief and have jurisdiction of the subject matter.

5. Where a party agrees to assign a claim, upon the delivery to him of certain notes by a certain day, and the notes are then tendered, the offer is thereby accepted and the contract complete. That acceptance is a sufficient legal consideration for the engagement. There is no want of mutuality in such a contract.

On final hearing on pleadings and proofs.

*Mr. B. Gummere*, for complainant.

*Mr. Henry Young*, for defendant.

THE CHANCELLOR.

This suit is for specific performance of an agreement made May 24th, 1872, by the defendant with the complainant, by which the former agreed to assign to the latter a debt of $2959.12, payable in gold, due from the firm of U. H. Dudley & Co. to the defendant. The bill also prays an injunction to restrain the defendant from assigning or parting with the note, which is the evidence of the debt, or from delivering it to any other person than the complainant, and to restrain the defendant from further prosecuting a suit at law, instituted by him in the Supreme Court of this state, on the note, against the debtors. The circumstances of the case are, that the firm of U. H. Dudley & Co., of the city of New York, failed in January, 1872. Their debts appear to have amounted to from $260,000 to $270,000. Among these was a debt of about $32,000 due to the firm of Cutting & Co. of San Francisco, of which the complainant was a member. The complainant, on hearing of the failure, came from that city to New York to look after his claim. Dudley & Co. first proposed to pay fifty cents on the dollar of their debts, and attempted to make such composition. Having failed therein, they, on the recommendation of the complainant, called a meeting of their creditors, which was held in or about March, 1872. At that meeting, the complainant, with two other creditors of the firm of U. H. Dudley & Co., were appointed a committee to examine the affairs of the concern. They did so, and at a meeting of the creditors, held on or about the 20th of the same month of March, reported that the assets would not pay over from thirty-eight to forty per cent. At that meeting, several of the creditors present, urged the complainant to take the assets and pay twenty-five cents on a dollar of the debts. To this he consented, and endeavored to effect such settlement, but after trying for two months he abandoned the effort, finding it impossible to make the arrangement, because some of the creditors insisted on payment in full, and others on a per centage beyond the amount proposed. It was a substantive part of this arrangement, that the com-

position was not to be binding on any of the creditors, unless all of them should accede to it. The complainant having announced to the other creditors, by means of a circular, his inability to effect this settlement, another meeting of the creditors was held at the Astor House, in the city of New York, on the 24th of May, 1872. At that meeting, the complainant stated, what he had communicated by the circular, his inability to effect the settlement, and the reasons of his failure in his effort. Some of the creditors were desirous that he should resume the undertaking, to which it appears he, after some conversation on the subject, replied only by a proposition to buy the claims of such of the creditors as would sell them to him, at the rate of twenty-five per cent., and pay for them in the notes of U. H. Dudley & Co., to be endorsed by the complainant's firm, and payable in six and twelve months from that time. This was agreed to, and the following agreement was drawn up and signed by all the creditors present, including the defendant, except one : " The undersigned, creditors of U. H. Dudley & Co. of New York, in consideration of one dollar to each of us in hand paid, the receipt whereof is hereby acknowledged, hereby agree to assign and transfer to Francis Cutting, their several claims against said U. H. Dudley & Co., on settlement therefor, by said Cutting, at the rate of twenty-five cents on the dollar, in six and twelve months, to be settled by notes of U. H. Dudley & Co., endorsed by Cutting & Co. of San Francisco ; notes to be dated May 27th, 1872, (May twenty-seventh, 1872,) provided the settlement is made and notes delivered on or before June 5th, 1872. Otherwise, this assignment to be null and void, not binding on said Cutting, unless signed by all the creditors."

On the 5th of June, the day fixed in the agreement, the complainant delivered notes to the creditors who had signed the agreement, according to the stipulation therein contained, and at the same time presented to them, to be executed, an assignment of their claims to him. The defendant, two days afterwards, returned to U. H. Dudley & Co., the notes and assignment, which had been sent to him by the complainant,

with the following letter, addressed to them : "At the last meeting of your creditors at the Astor House, Messrs. Cutting & Co. said, if they could not get all the creditors to sign, that they reserved the right to reject the affair. I find on inquiry, that quite a number have refused to sign off, therefore I return your papers." The complainant, on the same day, returned the notes and assignment to the defendant, with the following letter :

NEW YORK, *June 7th*, 1872.

MR. W. F. DANA. *Dear Sir :*

Yours of, to U. H. D. & Co., 7th, rec'd. The understanding was distinctly had that it was optional only with me, whether I made the settlement or not, that if I had the notes ready the agreement was binding on one creditor to assign his claim. Not a single creditor has been paid more than twenty-five cents, though it was mentioned at the meeting and understood that I was to do the best I could, but make the settlement if possible. I do not intend to pay one cent over that to any one, preferring to let the matter go into bankruptcy, holding such claims as have been assigned to me, and so paying any who stand out just what the law allows, and as $110 to $115,000 extra claims would be proved in bankruptcy, the chance of any who stand out getting more than twenty cents legally, or even that, would be very small.

I think, with this explanation, you will be perfectly satisfied, and send me the assignment as enclosed.

Yours very truly,

FRANCIS CUTTING,

153 Chambers Street.

The defendant, on the same day, returned the notes and assignment to the complainant, with the following letter :

"Yours of this date, to hand. In reply, would say that I talked with the chairman of the meeting at the time, and understood from him the same thing that I wrote Messrs. D. & Co., this A. M."

On the 13th of November, 1872, the defendant commenced the suit above mentioned, against the Dudleys, on the note for $2959.12, in the Supreme Court of this state. On the filing of the bill an injunction was issued, restraining the defendant from prosecuting that action. The defendant has answered. Replication was filed and testimony on both sides taken, and the cause is now before me on final hearing.

In the answer, the defendant alleges that the proposition made at the meeting of the 24th of May, was the same in substance as that discussed at the former meeting ; that nothing was said concerning a sale by the creditors of their respective claims to the complainant, to the defendant's recollection and belief; that the understanding which he had of the agreement was, that it was mutual in its obligation and operation, and not binding on either party, unless signed by all the creditors of U. H. Dudley & Co.; that the construction put upon the written agreement in the bill of complaint is not the construction which was put on it at the meeting ; that before he signed the agreement, the defendant asked the chairman of the meeting the following question : " Suppose all the creditors do not sign the paper ? " and that the chairman replied : " Then it is not binding." The answer further states that the defendant is informed and believes that the agreement was not signed by all the creditors of U. H. Dudley & Co., and that so far from the complainant, or his firm, endeavoring " to arrange a settlement for the best interests of all concerned," as represented in the complainant's letter of the 24th of May, (the circular above referred to,) the defendant is informed and believes that U. H. Dudley & Co., paid to certain of their creditors, more than twenty-five cents on the dollar of their claims, and particularly to Richard Oliva, who, at the time of such payment, had not signed the agreement, nor assigned his claim to the complainant. The answer further alleges that the agreement was made without consideration, and is not sealed with the seal of the defendant, nor of the other creditors ; that by reason of its intended operation, it is inequitable and unjust, and that, as it is understood

by the complainant, and construed in the bill of complaint, it is not the agreement of the defendant, but a trick and fraud upon him, whereby the complainant, to the defendant's surprise and injury, seeks to compel the defendant to do and act differently from what he, in good faith, intended.

The defendant's counsel insists that this suit cannot be maintained, because it is an action for the specific performance of an agreement for the sale of chattels—a contract for the sale of a debt. This objection is based on the proposition that a court of equity will not decree a specific performance of contracts, except for the purchase of lands or things that relate to the realty and are of a permanent nature; and that, where the contract is for chattels, and compensation can be made in damages, the complainant will be left to his remedy at law. The rule on the subject, which may be extracted from Lord Hardwicke's decision in *Buxton* v. *Lister &amp; Cooper*, 3 *Atk.* 383, is, that, though in general the Court of Chancery will not entertain a bill for specific performance of contracts for chattels relating to merchandise, but will leave the party to his remedy at law, yet, notwithstanding this general distinction between personal contracts for goods and contracts for lands, in some cases contracts for personal property are enforceable in equity, but the court will weigh such cases with greater nicety than those which relate to real property. This court, in *Furman* v. *Clark*, 3 *Stockt.* 306, entertained a suit for specific performance of a contract for sale of chattels— clay to be delivered on board the complainant's boats at Amboy. *Stevens* v. *Wilson*, 3 *C. E. Green* 447, was a suit in which the complainant filed his bill to compel the defendant to deliver to him certain shares of the stock of a plank road and ferry company, purchased by the defendant with money furnished by the complainant, on an agreement that the defendant would transfer the same to the complainant on request. There was a trust in that case, however. In *Wright* v. *Bell*, 5 *Price Exch.* 325, and in *Adderley* v. *Dixon*, 1 *Sim. &amp; Stu.* 608, a suit for specific performance of a contract to purchase a debt, was maintained. In *Doloret* v. *Rothschild*, 1 *S. &amp; S.*

590, it was held that an action for specific performance of a contract for the purchase of government stock would lie. *Duncuft* v. *Albrecht*, 12 *Sim.* 162, and *Todd* v. *Taft*, 7 *Allen* 371, are cases in which suit was maintained for specific performance of contracts for the sale of railway stock ; and in *Clark* v. *Flint*, 22 *Pick.* 231, a bill for specific performance of a contract for the sale of the half of a brig was sustained. In Adderley *v.* Dixon, the court, (Sir John Leach, V. C.,) said : "Courts of equity decree the specific performance of contracts, not upon any distinction between realty and personalty, but because damages at law may not, in the particular case, afford a complete remedy. Thus a court of equity decrees performance of a contract for land, not because of the real nature of the land, but because damages at law, which must be calculated upon the general money value of the land, may not be a complete remedy to the purchaser, to whom the land may have a peculiar and special value. So a court of equity will not generally decree performance of a contract for the sale of stock or goods, not because of their personal nature, but because damages at law, calculated upon the market price of the stock or goods, are as complete a remedy to the purchaser as the delivery of the stock or goods contracted for, inasmuch as with the damages he may purchase the same quality of the like stock or goods." In that case, the bill being for the performance of a contract to buy a debt due from the estate of two bankrupts, and so, being an agreement for the sale of the uncertain dividends which might become payable from those estates, the court, upon the principle established by the cases of *Ball* v. *Coggs*, 1 *Bro. P. C.* 140, and *Taylor* v. *Neville* cited in *Buxton* v. *Lister*, 3 *Atk.* 383, decreed specific performance, because damages at law could not accurately represent the value of the future dividends, and to compel the purchaser to take such damages would be to compel him to sell those dividends at a conjectural rate. Where the complainant has not a clear, complete and adequate remedy at law, or where some other ingredient of equity jurisdiction is mixed up with the transaction,

equity will interfere to decree a specific delivery of chattels. *Story's Eq. Jur.*, § 710.

In the present case, the complainant purchased of the defendant a debt due the latter from their common debtor, who had become insolvent. The evidence shows that the estate has proved insufficient to pay even twenty-five cents on a dollar, the price which the complainant agreed to pay for the debt in question. In a suit at law by complainant against the defendant, on this contract, the damages must be uncertain; they would depend on the present and prospective future ability of the debtors, into which many uncertain elements must, of necessity, enter. What the present pecuniary responsibility of the debtors is, does not appear. The suit at law was commenced within a very few months after their failure. If their responsibility is such that this debt could be recovered from them in full, it is easy to determine the amount of damages. It would be, in that case, a mere matter of arithmetical calculation. If, on the other hand, their responsibility is not such as that the whole amount of the note and interest could now probably be collected, then it would be impossible to estimate the damages. There is also another consideration. The complainant swears that it was his understanding with the creditors that he was to go into business with U. H. Dudley, when Dudley should have made a settlement, or when one should have been made, and that he had such an understanding with Dudley. It appears that he has since then entered into business with Dudley, becoming a special partner, and as such has contributed $60,000 to the capital, $20,000 of which were in the assets of the firm of U. H. Dudley & Co. He would be prejudiced in the business and his interest therein, if an execution against Uriah H. Dudley should be levied on the interest of the latter therein, and perhaps might himself be compelled to pay the execution to prevent disturbance or stoppage of the business. But however that may be, and as before stated there is no evidence before me as to the pecuniary responsibility of the Dudleys, if the contract is a valid one, one which can be enforced, the complainant is entitled to the

claim and the advantages to be derived from it. Again, the objection made by the defendant's counsel in this connection, that the complainant has a complete and adequate remedy at law in the premises, comes too late. As before remarked, the defendant has answered. In his answer he makes no objection on this ground. The complainant has replied to the answer, and testimony has been taken on both sides. It is too late for the defendant to make this objection. *Attorney General* v. *Purmort*, 5 *Paige* 620, 626 ; *Underhill* v. *Van Cortlandt*, 2 *Johns. Ch.* 339, 369 ; *Flint* v. *Clark*, *supra;* *Story's Eq. Pl.*, § 488 ; 1 *Daniell's Ch. Pr.* (4th ed.) 550, note 3.

Although the court may, of its own accord, dismiss the bill, where it appears on the hearing that the complainant has a complete and adequate remedy at law, notwithstanding the objection was not taken in the pleadings of the defendant, nor noticed in the argument, yet, under such circumstances, for very obvious reasons, it is the duty of the court to retain the cause, provided it be competent to grant relief and have jurisdiction of the subject matter. *Flint* v. *Clark*, *supra*. This court has jurisdiction in the case, and is quite competent to grant relief. But it is further objected by the defendant's counsel, that the contract in this case is unilateral, and it is insisted that therefore this court will not enforce it, because of the want of mutuality. It will be observed that the agreement is upon the expressed consideration of one dollar, and that by it the creditors who signed it, bound themselves to assign and transfer to the complainant their several claims against U. H. Dudley & Co., on the settlement therefor by the complainant, at the rate of twenty-five cents on the dollar, to be settled by notes of U. H. Dudley & Co., endorsed by Cutting & Co., to be dated May 27th, 1872, provided the settlements were made and the notes delivered on or before June 5th, 1872; otherwise the assignment was to be null and void. It is admitted that the complainant is in no default or laches, and that the notes were tendered to the defendant according to the agreement, and at the time stipulated. The

defendant did not withdraw from the contract until after the tender. By the tender, the complainant accepted the offer to assign the claim. That offer was, until that time, a continuing one. On its acceptance by the complainant, the contract was complete, and that acceptance was of itself, a sufficient legal consideration for the engagement on the part of the defendant. 1 *Parsons on Contracts* 406; *Boston and Maine R. R. Co.* v. *Bartlett*, 5 *Cush.* 224; *Potts* v. *Whitehead*, 5 *C. E. Green* 55; *Williams* v. *Williams*, 17 *Beav.* 213; *Dowell* v. *Dew*, 1 *Y. & C. C. R.* 345; *Thornbury* v. *Bevill*, *Id.* 554; *Eliason* v. *Henshaw*, 4 *Wheat.* 225; *Brisban* v. *Boyd*, 4 *Paige* 17; *Laning* v. *Cole*, 3 *Green's Ch. R.* 229; *Houghwout* v. *Bois-aubin*, 3 *C. E. Green* 315; *Pinner* v. *Sharp*, 8 *C. E. Green* 274. On the acceptance by the complainant, he became in equity the owner of the claim, and was entitled to an assignment of the note, which was the evidence of it.

It remains to consider the defence of mistake set up in the answer. The defendant alleges that he not only understood that the arrangement was not to be binding on him unless all the creditors entered into it, but that he inquired of the chairman of the meeting on the subject, and received an answer from him to that effect. The evidence shows, conclusively, that such was not the understanding; that the reason why the former arrangement had fallen through was, that it was on that condition; that the new arrangement was distinctly expressed and understood to be free from that feature; that the complainant was to purchase the claims of such of the creditors as were or should be disposed to sell to him on the terms specified in the written agreement, without regard to the claims of the other creditors, with whom he was to make such arrangement as he might be able. In the next place, the written agreement contains no provision that it was not to be binding on those who signed it unless it was signed by all the creditors. The chairman of the meeting swears positively, that he made no statement to the defendant such as the defendant testifies to on this score. That the defendant understood the agreement according to its terms, appears also

from his letter to Messrs. U. H. Dudley & Co. returning the notes. His language there is: "At the last meeting of your creditors, at the Astor House, Messrs. Cutting & Co. said, if they could not get all the creditors to sign, that they reserved the right to reject the affair. I find, on inquiry, that quite a number have refused to sign off, therefore I return your papers." He does not, in that letter, state that the understanding was that the agreement was not to be binding on the signers unless all the creditors should sign it, but that Cutting & Co. reserved the right to refuse to carry out the agreement unless all the creditors should sign it. In his letter of June 7th, 1872, to the complainant, in answer to the complainant's letter to him of that date, he refers to the statement contained in the last mentioned letter as being what he understood from the chairman of the meeting. The agreement is explicit in its terms. It is an agreement by the creditors who signed it, to sell their claims to the complainant on the terms there specified, to be strictly performed ; time being of the essence of the contract.; and with the proviso that no obligation should arise from the agreement, as far as the complainant was concerned, unless all the creditors should sign. Now, is it probable that the defendant was mistaken as to the terms of the agreement? The proceedings of the meeting of creditors were open to all who were present. There appears to have been no concealment, or attempt at concealment. The reason of the failure of the former effort was known to all through the circular, and besides, it was stated at the meeting, by the complainant. It was because of the refusal of some of the creditors to accept the terms of the arrangement, which required the concurrence of all the creditors to render it effectual. The creditors present, called on the complainant for a proposition, and he made one, the basis of which, was entire freedom on his part and obligation on the part of the creditors who should sign to sell their claims to him, notwithstanding the refusal of any or all others. The chairman, whose firm was a creditor to the amount of $28,000, in his testimony says: "I did not say to any one at that

meeting, that the creditors who signed the paper, were not bound, unless all signed it; the very object of the meeting was to avoid that." In his cross-examination he says: " It was proposed and passed by resolution, that Mr. Cutting should take assignments of the claims of the creditors who were there, at twenty-five cents on the dollar, and take the assets of Dudley & Co. The agreement was, that those who signed the paper, were bound to take twenty-five cents on the dollar and assign their claims, while it was left optional with Mr. Cutting to be bound by it or not. I think the agreement said that Mr. Cutting was not bound, unless he obtained the signatures of all the creditors." Mr. Dempster, a creditor to the amount of about $15,000, testifies that Mr. Cutting rose and stated to the meeting that, owing to the unwillingness of a number of creditors to accept the terms proposed at the former meeting, the arrangement had fallen through and that he withdrew from it, and the creditors, after considerable talk and discussion of the subject, urged him to make another effort, and he proposed to the meeting that he would buy their claims at twenty-five per cent., changing the time from four, eight and twelve months, to six and twelve months, and changing the dates of the notes from February to May, as he thinks, the date of the meeting; that there was considerable discussion over it, and considerable efforts made to induce some who were there to agree to it; that these efforts were made by different gentlemen, creditors; that the majority of the creditors were very anxious that the matter should be carried out, for fear that otherwise they would get nothing; that his impression is, that finally every body in the room agreed, but one; that the majority were quite anxious that the few who had held out should come in; that all the creditors were not present, but all who were, he thinks, agreed to it but one, and he was a foreigner by his accent; he seemed to think the other creditors should make him whole; that the agreement was read before it was signed; that the witness objected to the wording of the agreement, saying to the meeting, that those of them who sold their

claims to Mr. Cutting, were bound, while those who did not sign or were not present, might not be bound, and he proposed an amendment to the agreement, stipulating that the notes should be given on the 5th of June; that the amendment was incorporated into the agreement; that some one called on Mr. Cutting to give the names of those who were unwilling to sign, and the witness volunteered to go and see such of them as he thought he could influence, because he felt afraid that if they did not get more to sign than had expressed their willingness to sign, Mr. Cutting would not carry it out; that in going over the names of those who had refused to sign, Mr. Cutting named two or three who, he said, would not sign, and said it was of no use to go and see them, but said their amounts were not large, and if the witness could aid him in getting the signature of Knauth, Knachod and Kuhne, and the officer of some bank, whose name the witness cannot recall, and some other firm, he thinks in Exchange Place, that although the others did not sign, he would carry it out; that this conversation was public in the audience of the meeting; that the understanding was, and the understanding of the meeting was, that those who signed, were bound, while it was left optional with Mr. Cutting to be bound by the agreement or not; and the witness wanted to limit that option to the 5th of June; that neither the president, nor any one else, announced at that meeting, that the parties signing were not bound, unless all signed, but on the contrary, at the preceding meeting, the consent of all was necessary, as had been reported to him by his partner, (the witness was not present at the former meeting, but his firm was represented there by his partner,) and this was a substituted arrangement. On cross-examination he says, that the arrangement at the second meeting was, that those of the creditors who signed, should give Mr. Cutting until the 5th of June to decide whether he would buy their claims at twenty-five cents on the dollar or not, with the change in the time mentioned; that they were bound to sell, but he was not bound to buy, and that they could not take any legal pro-

ceedings until after the 5th of June, to secure themselves in any other way. He further says, that the agreement was read, but by whom he cannot say, but thinks by Mr. Chapman, (the chairman;) that objection was made to the agreement that it left it optional for an indefinite period with Mr. Cutting to carry out the bargain or not; that he made the objection himself, because he thought the time ought to be limited when that option should expire. Mr. Day, also a creditor, swears that he was present at the meeting, and that it was perfectly understood there that all the creditors would not sign, and that the only creditor at the meeting who did not sign was Mr. Oliva, who said he would not sign it unless he got one hundred cents on the dollar. He says, that at the first meeting, it was talked over generally whether the agreement then made, was binding unless all signed, and it was the distinct understanding that it was not; that the matter was discussed at the second meeting; that parties signing were bound to sell their claims to Mr. Cutting, whether others did or not; that Mr. Chapman read the agreement and a great many wanted to know what was the effect of the agreement if they signed it, whether they were holden and Mr. Cutting not, and Mr. Chapman said, in his opinion, they were holden; and he adds, " we signed with that understanding; I did, I know, and it was fully explained and discussed." He says, the matter was freely discussed, and Mr. Oliva would not accept it and left the room; that the expression of the meeting was most emphatic that any man signing the agreement was holden, irrespective of other creditors signing it; that the expression was ascertained by discussion; that there was no vote taken on it; that there were different views on the subject, and that it was known that there were several who would not come into the arrangement. He says, he thinks some of the parties had counsel present; that he thinks Mr. Oliva and others had their counsel there. The mistake which the defendant sets up in his answer is not proved.

There will be a decree for the complainant.